[Crim. No. 15546. Fourth Dist., Div. One. Apr. 1, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL A. HYDE, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Certified for publication with the exception of section III.

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert M. Foster and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—The present case presents the highly unusual circumstance of a first degree murder conviction where the body of the victim was never found. Nonetheless, the circumstantial evidence that the victim died and that the defendant planned and perpetrated his killing is so overwhelming as to require us to affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Daniel Hyde moved in with his girl friend, Jeanne Caulfield, in August of 1981. In March of the following year, Caulfield decided to terminate her relationship with Hyde because she wanted to date other men. She agreed to allow Hyde to continue living in her apartment until he received his income tax refund.

Hyde was not happy about Caulfield's decision and he made it apparent to her. On one occasion in April, she received a telephone call at work from a caller who identified himself as Steve Steinbeck, a man she had been dating the previous two weeks. She told the caller about Hyde's harassment of her, but then recognized that the caller was in fact Hyde. Becoming upset and frightened she called the police who met her at her apartment and ordered Hyde to leave.

Following his eviction, Hyde spoke to Caulfield on several occasions and learned from her that Steve Steinbeck was from Iowa and drove a truck. Hyde apparently located where Steinbeck lived and worked. He called Steinbeck's apartment, located at 1845 Hornblend St., and visited the Hub Liquor store where he worked, each time identifying himself as "Richard," a supposed friend of Steinbeck's from Iowa. Thereafter, Steinbeck's truck was vandalized when someone put sugar in the gas tank. Hyde admitted to Caulfield he knew about the incident but he disclaimed personal responsibility. On May 7, after Steinbeck was no longer seeing Caulfield, he returned to his apartment and discovered a man underneath his truck with a wrench and drain pan, loosening the bolts on the differential cover. When confronted, the man sprayed Steinbeck with a mace-type substance and fled. Hyde, a former police reserve officer with the San Diego Police Department, was trained in the use of mace. Steinbeck's description of his assailant generally matched Hyde, but when asked to view a photo lineup, Steinbeck identified the picture of another person as being closest to the man who attacked him.

Hyde continued to contact Caulfield by phone and in person throughout the latter part of April. In these conversations he demonstrated increasing emotional disturbance about the breakup of their relationship. Caulfield agreed to meet Hyde at a Sambo's restaurant late on the night of April 30. Hyde became upset during their conversation and asked if they could go out to his car because he did not want to cry in the restaurant. While talking in his car, Hyde told Caulfield he wanted to get back together and asked her questions about the men she was currently dating. In response Caulfield told Hyde she was going out with a man named "Felix." Her reference was to Felix Olivier, the eventual murder victim.

Hyde became angry when Caulfield refused to resume their relationship. Caulfield attempted to get out of the car but was grabbed by Hyde who began crying. When she again told Hyde she did not want to get back together, he hit her across the face and began choking her. Caulfield lost consciousness.

Caulfield regained consciousness soon thereafter and was aware that Hyde was checking her pulse and giving her mouth-to-mouth resuscitation. Hyde then started the car and drove toward the house where he was staying. On the way, he told Caulfield he was not taking her back where she could turn him in for attempted murder and that the incident was all her fault because she wanted to date other people. Hyde stopped at a restaurant parking lot near his house and had Caulfield get out of the car to see if she could walk. He told her not to think about screaming for help. He then took her to his house where they spent the night.

The next morning Hyde acted as though the couple had never broken up. He drove her back to the Sambo's restaurant where they had breakfast. Hyde began to cry, telling Caulfield he just wanted her to be happy and that he was not going to see her again. Caulfield then drove home.

Caulfield's respite proved short-lived. Approximately a week later, as she was driving to her sister's home in El Cajon where she was staying, Caulfield noticed Hyde's car following her. Becoming frightened, she drove immediately to the El Cajon Police Department. As she attempted to enter the parking lot, Hyde cut in front of her, causing their cars to collide. Hyde then got out of his car and began to pound his fists on the hood of Caulfield's car. Hyde moved and Caulfield was able to drive into the parking lot where a blast on her car's horn summoned six police officers who talked with her and Hyde separately.

At about this same time, Caulfield with Felix Olivier's help contacted an attorney to obtain a restraining order against Hyde. The request for an order to show cause and temporary restraining order was filed with the court on May 11 and served on Hyde on May 13.

Olivier stayed with Caulfield at her apartment on the night of May 7. Hyde called Caulfield early the following morning and threatened that if she got a restraining order, "it would cost [her] nothing but money and heartaches . . ." and that a restraining order would not stop him. Olivier grabbed the phone and asked, "Who is this?" and gave the phone back to Caulfield. Hyde then repeated his warning and told Caulfield she would have more trouble than she dreamed was possible. Shortly thereafter, Caulfield had her phone number changed.

Olivier lived with his parents in a house on Waring Road in San Diego. Caulfield spent the week of May 9 with the Oliviers, returning to her apartment only to pickup clothes. During that week, Olivier's father, also named Felix, received a phone call from a caller who identified himself as "Richard" and asked if Mr. Olivier's son still lived on Waring Road. The caller, who refused to leave a phone number, said he was a friend of Felix from high school. During the conversation, Mr. Olivier informed the caller that Felix worked for Hewlett-Packard in Rancho Bernardo and that he drove a Fiat.

During the next week, Caulfield's car was sabotaged on two occasions. On May 14, the car would not start and it was discovered that more than a gallon of water had been poured into the fuel tank. On May 17, someone drained all the fluid from the car's differential, causing nearly $500 damage.

The following week, Caulfield and Olivier spoke by phone but agreed to meet only once, clandestinely, at a movie theater on May 23, Felix Olivier's birthday. The next day, May 24, the couple spoke by phone and planned to go to Universal City on the upcoming Memorial Day weekend. That afternoon, Olivier left his parent's house between 1 and 2 and went to work at Hewlett-Packard in Rancho Bernardo.

Several of Felix Olivier's coworkers testified they left work at approximately the same time, 11:15 p.m., went to their cars, and exited the Hewlett-Packard parking lot in succession. From their testimony, it appears there was a marked San Diego police car parked across from the Hewlett-Packard gate as these individuals left.[2] It started up and soon passed the last two cars in the succession and began following Felix Olivier as he turned onto the entrance to southbound Interstate 15. Shortly after getting on to the freeway, the police car's flashing light bar was activated and Olivier pulled over onto the freeway shoulder with the police car behind his vehicle. Another Hewlett-Packard employee proceeding southbound on Interstate 15 a few moments later testified he saw Olivier with his hands up facing a man generally matching Hyde's description in a police uniform. The "officer" then pushed Olivier into the back of the police car. This witness picked out Hyde's photo as possibly being the man he saw with Olivier that night. Olivier was never seen nor heard from again.

---

[2]Three witnesses testified they saw a marked San Diego police car parked near the Hewlett-Packard offices during the week prior to Felix Olivier's disappearance. One of the witnesses, Officer Walter Hadaway of the San Diego Police Department, was on patrol in the Rancho Bernardo area when he spotted another police car at approximately 11:15 in the evening. He approached, intending to contact the other officer, but the second police vehicle started up and drove away. Hadaway identified Hyde as the driver of the parked police car.

Because he was a former reserve police officer, Hyde had access to numerous items of police equipment. A search of his residence, garage and car after his arrest yielded the following items: uniform pants, shirt, tie, belt and shoes of the type commonly worn by San Diego police officers; a police-type gun belt and revolver; ammunition for the revolver; police handcuffs, flashlight and whistle; a set of universal keys for San Diego police vehicles,[3] a police reserve parking permit; a .22 calibre rifle and a 20-guage shotgun; diving equipment; a business card with the name "Hewlett-Packard" written on the back; an envelope with the written words, "Steve, 3757 Miss. Blvd., 488-4373, 1845 Hornblend"; and a receipt from Hub Liquor and Delicatessen with the words "Richard stopped by to see Steve. 274-1306" written on the back.

Not long after San Diego police received the report of Felix Olivier's disappearance from his parents and had talked to Jeanne Caulfield, their suspicion focused on Hyde.[4] They had Caulfield place a note on Hyde's windshield asking him to call her. The phone call, which was tape recorded, indicated that Hyde knew various details about Olivier and his relationship with Caulfield that he could have only learned from Olivier. Further, Hyde's comments during the conversation strongly suggest he knew something about the reason for Olivier's disappearance.[5] Later in the conversa-

---

[3]Personnel with the San Diego Police Department testified that officers are routinely issued three universal vehicle keys of the type found in the search of Hyde's residence. One key fits each of the three makes of police cars: Ford, Chrysler and General Motors. The keys will unlock and start any police car of the appropriate make. It was further explained that police cars not currently in use were left unlocked in parking lots at various police substations throughout the city and that no one checked to insure that a person taking a spare vehicle from a substation lot was authorized to do so.

[4]A member of the police surveillance team testified that on two successive dates during the week following Olivier's disappearance, Hyde drove to the area of Adobe Falls Road and Waring Road, near Caulfield's apartment.

[5]The following is an excerpt from the transcript of the phone conversation:

"HYDE: [Felix] got what he wanted from you and then when he got it he didn't want to have anything to do with you, but he bullshitted you. He told you that you had too deep a personal problems and family problems and everything else. Obviously all he wanted was one thing from you and then he got it and then he didn't want to have anything to do with you. He managed to get you to go to the garage sale and everything else.

"CAULFIELD: Well, I am not going to call him if he doesn't call me. It just will be someone new. I will just find someone else. What are you talking about garage sale? My God, what are you, his best friend or something?

"HYDE: You can always find somebody new. There is no problem there. There is no problem. Easy, no problem. You might even live with him for a year. No problem, easy, simple, but call him. I definitely guarantee you will be surprised.

"CAULFIELD: Call him about—what do you mean I'll be surprised?

"HYDE: Well, call him, you know. His parents answer the phone and you'll be surprised.

"CAULFIELD: Oh, a happy surprise? What are you talking about? Call him and if he is there—if his parents answer the phone, I will be surprised? I don't—

"HYDE: Go ahead.

tion, Hyde indicated he would no longer continue talking to Caulfield unless she immediately came over to his house. Otherwise, he explained, "[e]verything else can remain a mystery for the rest of your life . . . ."

Considerable evidence was also presented indicating that Felix Olivier had no reason to suddenly and voluntarily leave the San Diego area.

Hyde was charged with the first degree murder of Felix Olivier (Pen. Code, §§ 187, 189),[6] assault with force likely to produce great bodily injury on Jeanne Caulfield (§ 245, subd. (a)(1)) and false imprisonment of Jeanne Caulfield (§§ 236, 237). Hyde did not testify at trial. The testimony of the witnesses he called on his own behalf was marginally relevant at best and did nothing to detract from the essence of the prosecution's case. The jury returned verdicts of guilty on all counts.

---

"CAULFIELD: What for? What are you matchmaking for me or something?

"HYDE: Go ahead, Babe. Go ahead. You will be very surprised and then you are really going to hate me and then we will be nice and even because you will hate me.

"CAULFIELD: Well, you have been following him, haven't you? You had to have been. What did you do to him? Why are you telling me to call him?

"HYDE: I don't know anything about the man.

"CAULFIELD: You don't know anything about him?

"HYDE: No he is just a boy. I don't know anything about boys.

"CAULFIELD: He is just a boy. Why will I hate you?

"HYDE: Call him. I guarantee it.

"CAULFIELD: Will you call me back later, please?

"HYDE: Probably not. You probably will be making a thousand phone calls.

"CAULFIELD: Did you do something to him?

"HYDE: Of course not, baby. I don't know anything about him. I don't even know his name—(unintelligible). But just remember, remember what I told you about the restraining order? What did I say would happen if you—tried to get one.

"CAULFIELD: Yes, you did, you did something to him. Now that I think of it, he was supposed to call me yesterday.

"HYDE: Remember what I said.

"CAULFIELD: What?

"HYDE: If you try to get a restraining order against me it will cost you nothing but money and heartache.

"CAULFIELD: I don't remember you said that. I thought you said—

"HYDE: I called you the day you gave the phone to Felix, May the 8th, after he spent the night over there, and I said 'If you seek a restraining order against me, it will cost you nothing but money and heartache.' So far you have seen the money.

"CAULFIELD: Why are you telling me to call Felix now? He should be at work.

"HYDE: Go ahead and call his house.

"CAULFIELD: My God, what did you do to him? Why are you asking me to talk to him?

"HYDE: Go ahead, baby. *Money and heartaches; and if you try and pursue it any further, the same thing will happen.*

"CAULFIELD: What are you saying? I am confused. If I try to pursue what later the same thing will happen?

"HYDE: If you call him, you are going to get really pissed off."

[6]All statutory references are to the Penal Code.

DISCUSSION

I

Hyde makes three contentions regarding the correctness of the instructions given to the jury on which it was to base its verdict on the first degree murder charge. He argues that certain instructions which were given (i.e., alternative theories of first degree murder) should not have been and that certain instructions which were not given (voluntary manslaughter) should have been. Proper evaluation of these contentions requires a close analysis of the facts, the inferences which the jury could have drawn from the facts, and the strength of those possible inferences.

There appear to be two preliminary facts the jurors would have to determine before there would be any need to apply any of the murder or manslaughter instructions. They would first need to conclude that Hyde was the "police officer" who was observed stopping Olivier on Interstate 15 and pushing him into the back seat of a marked patrol car on May 24, 1982. Of this the evidence demonstrates there can be no doubt and Hyde realistically concedes the fact in his brief. The jury would next need to find that Hyde caused Olivier's death at some point after he kidnaped him. Again, this fact likely posed no stumbling block for the jury. Olivier had no reason to voluntarily disappear. He was last observed being forced into the police car by Hyde. Hyde's comments to Caulfield in the tape-recorded phone conversation indicate he knew what had happened to Olivier. Absent additional evidence, the only reasonable conclusion is that Hyde killed Olivier at some point after he kidnaped him.

Having drawn these conclusions, the only remaining task for the jury would be to assess Hyde's mental state with respect to the killing of Felix Olivier. It is in this context that Hyde's three instructional contentions become relevant.

A

██ Hyde initially contends the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense of murder. The court refused Hyde's request for the instruction, concluding there was no evidence from which a reasonable jury could conclude that Hyde was guilty of voluntary manslaughter. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].) Hyde contests that conclusion, pointing to evidence he claims would support a "heat of passion" theory. He further argues that the failure to instruct on manslaughter had the effect of creating an unconstitutional presumption of malice from proof by the

prosecution of an unlawful killing. We are unable to accept either contention.

In arguing that a "heat of passion" theory is suggested by the evidence, Hyde points to his apparent extreme jealousy and preoccupation with Jeanne Caulfield's new boyfriends. He then seeks to rely on those cases in which a "heat of passion" defense was supported by evidence of extreme jealousy. (See, e.g., *People* v. *Wickersham* (1982) 32 Cal.3d 307, 326-327 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Berry* (1976) 18 Cal.3d 509, 514 [134 Cal.Rptr. 415, 556 P.2d 777].) It is important here, however, to distinguish between jealousy as a motive for the killing and jealousy sufficient to invoke the "heat of passion" concept. It is clear that Felix Olivier was killed because Hyde was jealous of Olivier's ongoing relationship with Jeanne Caulfield. But that fact, in and of itself, is insufficient to allow a reasonable jury to conclude that Hyde killed in the "heat of passion." In order to warrant the giving of a voluntary manslaughter instruction, the evidence of defendant's jealousy must be such as to suggest he did not either intend to kill or act in conscious disregard of a substantial probability that death would result. Furthermore, defendant's "passion" must be the result of "sufficient provocation." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d 668, 684, fn. 12; *People* v. *Wickersham, supra,* 32 Cal.3d at p. 326.)

In the present case, the evidence suggests neither passion in the sense of "violent, intense, high-wrought or enthusiastic emotion" (*People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97], quoted in *People* v. *Berry, supra,* 18 Cal.3d at p. 515) or any—let alone sufficient—provocation. It was firmly established at trial that Hyde contrived an elaborate plan to abduct Olivier and that he stalked the victim for several days before the actual killing. Not only do we refuse to countenance any suggestion that Olivier's mere dating of Caulfield after she broke up with Hyde constitutes provocation, but in any event Hyde's elaborate plan indicates that "sufficient time [had] elapsed . . . for passion to subside and reason to return . . . ." (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 327, quoting CALJIC No. 8.42 (1979 rev.).) As in *Wickersham,* the evidence is simply insufficient to allow a reasonable jury to conclude the killing of Felix Olivier constituted voluntary manslaughter because Hyde acted "in the heat of passion."[7]

---

[7]We note further that Hyde concedes the evidence established he kidnaped Olivier. By operation of the second degree felony murder rule, any killing in the course of the kidnaping would be at least second degree murder irrespective of Hyde's mental state. (But see *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829, fn. 3 [201 Cal.Rptr. 319, 678 P.2d 894]; see also *id.,* at pp. 836-854 (conc. opn. of Bird, C. J.).)

■ Hyde further suggests that the trial court's failure to give a voluntary manslaughter instruction may have been due to application of the principles found in section 1105. That section provides that where the defendant is shown to have committed a homicide, the burden of producing evidence to justify, excuse or mitigate the homicide devolves upon the defendant unless such evidence was already part of the prosecution's case. (*People* v. *Cornett* (1948) 33 Cal.2d 33, 42 [198 P.2d 877]; *People* v. *Kelley* (1980) 113 Cal.App.3d 1005, 1008-1013 [170 Cal.Rptr. 392]; *People* v. *Loggins* (1972) 23 Cal.App.3d 597, 601 [100 Cal.Rptr. 528].) Noting that he failed to testify in his own defense and recognizing that the circumstantial evidence demonstrating he killed Olivier was overwhelming (see *ante,* p. 472) Hyde argues that the lack of a voluntary manslaughter instruction amounted to an unconstitutional presumption of malice prohibited by a series of United States Supreme Court cases beginning with *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881] and including *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]. He explains that even if the trial court correctly concluded the evidence would not reasonably support a finding of voluntary manslaughter, the failure to give that instruction improperly removed the issue of malice from the jurors and forced them to find him guilty of murder once they concluded he killed Olivier.

The responses to this contention are several. First, the jury was properly instructed that malice was an essential element of murder. Thus, in order to convict Hyde of murder, the jury was required to find that he acted with the intent to kill or in reckless disregard of human life. Malice was in no sense removed from the jury's consideration. Furthermore, we are unable to see how Hyde could be prejudiced by the court's failure to instruct on a criminal offense which no rational jury could conclude had been committed based on the evidence presented.[8] (See *ante,* p. 473.)

Equally important, it occurs to us that Hyde's argument confuses two different concepts. *Mullaney* v. *Wilbur* and its progeny stand for the proposition that the state may not impose on the accused the burden of negating an essential element of the crime charged. In *Mullaney,* for instance, Maine law provided that an unlawful killing was presumed to be murder unless the defendant established by a preponderance of the evidence that the killing was without malice. At least since *People* v. *Cornett, supra,* 33 Cal.2d 33, California courts have recognized that application of section 1105 imposes

---

[8]We recognize that our system precludes the court from overturning even an irrational verdict in a defendant's favor. To the extent Hyde is suggesting a defendant is entitled to instructions which cater to the possibility of such irrationality by providing a menu of criminal offenses not supported by the evidence, we do not agree.

no burden of proof or persuasion on the criminal defendant, thus anticipating the *Mullaney* result a quarter century before *Mullaney* was decided. (*People* v. *Kelley, supra,* 113 Cal.App.3d at p. 1013.)

█ Properly interpreted, section 1105 merely reflects the commonsense observation that the circumstances of a killing may and often do suggest an inference of malice.[9] Under such circumstances, a prima facie case of murder is established and the burden of producing evidence negating malice falls to the defendant who is, needless to say, in the best position to produce such evidence. Where either the prosecution evidence or evidence presented by the defendant is sufficient to raise a reasonable doubt as to whether the killing was malicious, the prosecution bears the burden of persuading the jury as to the defendant's actual mental state. Where such evidence is non-existent, however, the prosecution's burden has already been met. It is simply incorrect to contend, however, as Hyde does here, that the jury could have concluded it was "as likely as not" he killed Olivier without malice but nonetheless convicted him of murder. The jury necessarily found under the instructions as given that Hyde acted with malice in killing Felix Olivier.

## B

Even if his requested instruction on voluntary manslaughter was properly refused, Hyde argues the evidence was insufficient to support the instructions which were given on first degree murder. The jury was presented with two first degree murder theories with which to analyze the case. Instructions were given on standard premeditated first degree murder and first degree murder under a "lying in wait" theory. Hyde's argument with respect to the "lying in wait" instruction requires that we explore the legal parameters of that theory of first degree murder.

█ Section 189 provides that "[a]ll murder which is perpetrated by means of . . . lying in wait . . . is murder of the first degree; . . ." The statute assumes that if the means of the murder are by lying in wait, those means adequately establish the murder as the equivalent of a premeditated murder without any additional evidence of the defendant's mental state. (*People* v. *Thomas* (1953) 41 Cal.2d 470, 477-478 [261 P.2d 1] (conc. opn. of Traynor, J.).) Nonetheless, the prosecution must first establish a murder within the meaning of section 187—that is, a killing with malice—before the means of the killing take on significance. (*Id.,* at pp. 478-479.)

█ In order to establish that the murder was by means of lying in wait, "the elements of waiting, watching, and concealment for the purpose of

---

[9]That such an inference is not mandatory is demonstrated by the statement in section 1105 that the evidence in the prosecution's case may itself indicate the killing was without malice.

taking the victim unawares" must be proven. (*Id.*, at p. 480; *People* v. *Tuthill* (1947) 31 Cal.2d 92, 100-101 [187 P.2d 16]; *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000, 1007 [181 Cal.Rptr. 486]; see also *People* v. *Atchley* (1959) 53 Cal.2d 160, 175 [346 P.2d 764].) Hyde concedes there is ample evidence of his watching and waiting for Felix Olivier. He argues, however, that there is insufficient evidence of any concealment on his part and that the killing of Felix Olivier, if it occurred, was not the *result* of Hyde's watchful waiting. Accordingly, he contends the trial court erred in presenting the "lying in wait" theory to the jury.

In support of his concealment argument, Hyde points to the evidence indicating he followed Olivier in a police car with lights flashing and stopped him on the freeway in full view of numerous witnesses. He suggests these facts are inconsistent with the element of concealment. While it is true his entire person was not concealed in the sense of an ambush, the Supreme Court in *People* v. *Tuthill, supra,* 31 Cal.2d 92 specifically held that "lying in wait" within the meaning of section 189 was not limited to ambush-type situations. " '[T]o constitute lying in wait to commit murder the perpetrator must be in ambush *or* concealment for the purpose of taking his victim unawares.' " (*Id.*, at p. 100, quoting 26 Am.Jur., § 16, p. 165; see also *People* v. *Ward* (1972) 27 Cal.App.3d 218, 229-230 [103 Cal.Rptr. 671].)

Here, Hyde's true identity and purpose were concealed from Olivier because Hyde was disguised as a police officer. Not only did the disguise conceal Hyde but it also facilitated his obtaining "a position of advantage" over Olivier (*Ward, supra,* 27 Cal.App.3d at p. 230) by virtue of the usual deference accorded law enforcement officials by citizens, which enabled Hyde to easily control and later dispose of his victim. Concealment by disguise is, in our view, sufficient to support the giving of a "lying in wait" instruction.

Nor are we persuaded by Hyde's contention that there is an insufficient temporal nexus between the killing and the "watchful waiting." The facts at trial indicated that Hyde stalked the Hewlett-Packard facility for several days prior to Olivier's disappearance, waiting for an opportune moment. On May 24, Hyde parked outside the Hewlett-Packard gate waiting for Olivier to leave. He followed and stopped Olivier in the guise of a police officer making a traffic stop. His identity and purpose still concealed, Hyde then kidnaped his victim in order to remove him to a less visible location to accomplish the killing. We view that kidnaping as a logical and integral part of Hyde's homicidal plan which does not mean that the killing "did not follow on the heels of the watchful waiting." (*People* v. *Merkouris* (1956) 46 Cal.2d 540, 560 [297 P.2d 999].) Rather, each step in the planned sequence of events followed uninterrupted from the prior step, indicating that

"the killing was accomplished by the means of his watching and waiting in concealment." (*People* v. *Harrison* (1963) 59 Cal.2d 622, 631 [30 Cal.Rptr. 841, 381 P.2d 665].) The "lying in wait" instruction was, therefore, properly given.

## C

■ Relying on *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], Hyde also contends the court erred in instructing the jury on premeditated first degree murder. In *Anderson,* the Supreme Court structured a framework for analyzing sufficiency-of-the-evidence contentions as they relate to premeditated first degree murder. According to the *Anderson* court, evidence which would support a finding of premeditation generally falls into three categories: "(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed towards, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a 'preexisting reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."[10] (*Id.,* at pp. 26-27.)

---

[10]To these three categories we might suggest a fourth which we view as more or less implicit in the *Anderson* decision, that being statements or conduct of the defendant after the killing to the extent they indicate the killing was part of a preconceived and deliberate plan. We extrapolate this fourth category by negative implication from *Anderson*'s warning that "cover-up" evidence is generally irrelevant because it only casts light on the defendant's mental state *after* the killing. (70 Cal.2d at p. 32.) Statements made after the killing, however, in the form of a confession or incriminatory admissions, may relate to a preexisting state of mind. Similarly in the present case, Hyde's statements to Caulfield after Olivier's disappearance, although hardly determinative on the issue, indicate his desire to use Olivier's death to punish Caulfield and thus suggest that Olivier's death was part of a preconceived plan of revenge.

In the present case, because Olivier's body was never found, there is no category (3) or "manner"-type evidence. Nonetheless, evidence falling within the first two categories is substantial. Hyde concocted an elaborate scheme which began more than a week before Olivier's death when he contacted Olivier's father using an assumed name and learned where Olivier worked and the model car he drove. Hyde then stole a police car on not one but several occasions in order to stalk Olivier, and impersonated a police officer on each of those occasions. Given the severe legal consequences associated with stealing a police car, impersonating a police officer and kidnaping, it is unlikely Hyde would have risked those consequences if the object of his planning was other than to kill Olivier. Further, the fact that Olivier's body was never found circumstantially suggests a preconceived plan to dispose of the body.

As to motive, Hyde's actions toward Caulfield and the men she dated after the breakup demonstrate a pattern of increased hostility and violence. When his harassment of Caulfield did not cause her to change her decision to date other people, Hyde resorted to vandalizing Steve Steinbeck's truck and Caulfield's car. He assaulted Steinbeck with a can of mace and physically assaulted Caulfield when she again refused to resume their relationship. When Olivier helped Caulfield obtain a restraining order against Hyde's conduct, Hyde threatened Caulfield and it is reasonable to assume he determined more severe tactics were required against both Caulfield and Olivier. It appears at that point that Hyde's primary motivation changed from resuming his relationship with Caulfield to exacting revenge.

Finally, we cannot ignore Hyde's statements to Caulfield in the recorded phone conversation. (See *ante,* fn. 5.) Once it was established to the jury's satisfaction that Hyde had killed Olivier (see *ante,* p. 472), Hyde's comments permit the inference not that he was concealing his guilt but rather that he was savoring the results of a vengeful plot by giving Caulfield hints which would cause her to discover Olivier's fate and suspect Hyde was responsible. Such a frame of mind strongly suggests that Olivier's death was the planned and anticipated result of Hyde's elaborate scheme.

Viewing this totality of the evidence in the light most favorable to the judgment, we conclude the trial record is clearly sufficient to support a finding beyond a reasonable doubt that Hyde premeditated the murder of Felix Olivier. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Accordingly, the trial court did not err in instructing the jury on a premeditation theory of first degree murder.

## II

■ Hyde next challenges the court's decision to inform prospective jurors prior to voir dire that although the case was a murder case, the death penalty was not involved. Noting that questions of penalty were irrelevant to the jury's task in this case (see *People* v. *Shannon* (1956) 147 Cal.App.2d 300, 306 [305 P.2d 101]), Hyde relies on cases such as *People* v. *Ramos* (1984) 37 Cal.3d 136, 157 [207 Cal.Rptr. 800, 689 P.2d 430] and *People* v. *Morse* (1964) 60 Cal.2d 631, 653 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810] in arguing that the court's comments to prospective jurors "tend[ed] to diminish the jury's sense of responsibility for its action." (*Ramos, supra,* 37 Cal.3d at p. 157.)

In explaining its decision to inform the venire that this was not a potential death penalty case, the court stated as follows: "I do this only because I am aware of human nature and I am aware of certain individuals that just would not feel comfortable in serving on a case if they thought that at sometime in the future they would have to deal with the penalty question, and I know from past experience that if I don't inform them at the outset, then at sometime during the trial we are going to get that question from one of the jurors and we are going to have to meet that question then. I do not think it is inappropriate to come up front with the jury in this case or in any case where it doesn't prejudice the defendant."

We believe the trial court's comments were proper and prudent. The public commonly understands that in contrast to other criminal cases, the jury in a death penalty murder case must determine penalty as well as guilt. The moral and ethical questions surrounding the use of the death penalty have generated considerable social debate. It is reasonable to anticipate that a significant number of prospective jurors might question their ability to sit on a jury which potentially would have to consider imposition of a sentence of death. Not only did the trial judge's decision to raise and dispose of the issue at the outset save time and unnecessary strain on potential jurors' psyches, but it also avoided any possibility that a prospective juror's concern about serving on a death penalty case might skew his answers to voir dire questioning.

Furthermore, we think it impossible to contend that a jury charged with trying a murder defendant in a noncapital case is more likely to unfairly convict because of a diminished "sense of responsibility." The only contention which has been seriously advanced in this regard is that because the issue of the morality of the death penalty is independent of a defendant's guilt or innocence in an individual case, a juror morally opposed to the death penalty may be inclined to acquit a guilty defendant rather than impose

what he perceives to be an immoral penalty. (See § 1074, subd. 8; see also *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].) We do not believe a defendant in a noncapital case is entitled to foster uncertainty with respect to potential penalties in hopes that one or more jurors conscientiously opposed to capital punishment will be unjustifiably swayed to acquit.

III*

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Judgment affirmed.

Lewis, J., and Lester, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied July 10, 1985.

---

*See footnote 1, *ante,* page 463.

†Assigned by the Chairperson of the Judicial Council.