Filed 4/23/25  P. v. Toscano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  MIGUEL HERNANDEZ TOSCANO,  Defendant and Appellant. | E083087  (Super.Ct.No. INF2200425)  OPINION |

APPEAL from the Superior Court of Riverside County.  Jason Armand, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

When his girlfriend of eight months tried to end their relationship, defendant and appellant Miguel Hernandez Toscano stabbed her to death while her young daughter pled with him to stop. A jury convicted Toscano of first degree murder (Pen. Code, § 187, subd. (a) )[1] and found true a deadly weapon use enhancement (§ 12022, subd. (b)(1)). On appeal, Toscano argues that the record contains insufficient evidence that (1) he did not kill the victim in the heat of passion, and (2) he premeditated and deliberated her killing. We affirm.

FACTUAL BACKGROUND

A. *Prosecution's Evidence*

Toscano and the victim, Jane Doe, met at the casino where they both worked and had been dating for about eight months. At approximately 9:00 p.m. on March 1, 2022, Toscano attacked Doe with a knife in the backyard of the apartment where she lived with her mother, brother, and three young daughters.

Doe's nine-year-old daughter, A., witnessed part of the attack and tried unsuccessfully to stop Toscano. At trial, A. testified that she and her two younger sisters were in the living room watching television while her mother was folding laundry in the backyard. When A. went out to the backyard to ask her mother a question, she saw Toscano drag her mother to a corner of the backyard and attack her. It was dark in the backyard, but A. could see that her mother was on the ground and "trying to get up," but

---

[1] Unlabeled statutory citations refer to the Penal Code.

2

Toscano was "holding her by the neck" and "hurting her in some way." A. tried throwing rocks at Toscano and yelling at him to stop. When that did not work, she ran into the house and tried calling 911 on her mother's cellphone, but her calls did not go through, so she rushed to her next-door neighbor's apartment and asked them to call the police for her.

At trial, the prosecution played a recording of the 911 call. A. told the dispatcher: "[M]om screamed and [Toscano] had a knife. Uh, I don't know where he got the knife from but, but, uh, the last thing I know, my mom [was] on the floor and . . . he was still putting the knife on her spine." A. asked the dispatcher, "Can you take my mommy to the hospital" and asked multiple times if her mother was going to live. She thanked the dispatcher for helping, and when the dispatcher said, "You're welcome," she replied, "[C]an you tell me happy things, like if she will make it?"

When the police arrived at Doe's apartment, they found Doe deceased, lying face up in a corner of the backyard, next to a broken butcher knife. She had cut marks on her left hand, which was raised up toward her head; multiple cut marks on her wrists; and there was a significant amount of blood on her neck and chest. At trial, the parties made the following stipulation regarding Doe's injuries and cause of death: "[Doe] died of multiple sharp-forced injuries. [¶] The injuries consisted of three stab wounds to the left side of the chest damaging the pulmonary artery. A stab wound to the middle of the left breast damaging the heart. Two stab wounds to the outside of the left breast damaging the lung. A stab wound to the right breast penetrating the liver. A stab wound to the left chest piercing the diaphragm and stomach. A stab wound to the left back damaging the

3

left lung. [¶] Additionally, [Doe] sustained cut or stab wounds to the scalp, below the clavicle, above the sternum, the right breast, left cheek, the neck, left shoulder, left nipple, left breast, left arm, left chest, left wrist, and the right side of the back."

Around 11:00 p.m. that evening, Toscano turned himself in at the police station. In his police interview, Toscano admitted that he had attacked Doe with a knife. He began the interview by saying: "I came to turn myself in quickly. Why? Because I know what I did. So, that's why I didn't . . . run. I don't run from anything because I will face the consequences of my actions. And that's why I came here to turn myself in. But that's why, because I have suspicions, right? This afternoon we argued because of the same thing." When asked what he and Doe had been arguing about, he explained that about three months ago he "found another person's phone number on her phone," and that they had been arguing about whether she was cheating on him ever since. He said that Doe always denied that she was seeing someone else, but he did not trust her because she "seem[ed] very suspicious." He told the police that he had driven by the casino on a day she was supposed to be at work and had not seen her car in the parking lot.

Toscano described the events leading up to his attack. He said that he had gone to dinner with Doe and her family at their neighbor's house earlier that evening. Before dinner, he argued with Doe about whether she was cheating on him, and the argument started up again after dinner when the two of them were in Doe's backyard. At some point during the argument, Toscano offered to pick up Doe's daughters from school the next day, and Doe responded that she would have someone else pick the girls up because she did not want to have anything to do with him anymore. Realizing that she was

4

breaking up with him, Toscano became "so angry," walked into the house, grabbed a butcher knife from the kitchen drawer, went back outside, and stabbed Doe in the chest, multiple times. Toscano told the police that he was "very jealous." He also said, "I don't want her to be in another man's arms, and that's why I did it."

After the attack, Toscano left Doe's backyard on foot. Before coming to the station to "face the consequences," he washed his hands on the sidewalk.

B. *Defense Case*

Toscano's niece testified on his behalf. She said that she had known Toscano for most of her life and he was like a father to her. She had never seen him act violently or mistreat any of their family members. She believed that he was a peaceful person and found the allegations against him "hard to accept."

C. *Verdict and Sentencing*

The trial court instructed the jury on first and second degree murder and voluntary manslaughter under the heat of passion theory. The focus of closing arguments was whether the killing was the product of provocation or of reflection sufficient to constitute premeditation and deliberation.

The jury found Toscano guilty of first degree murder and found true the allegation that he personally used a deadly or dangerous weapon. (§§ 187, subd. (a), 12022, subd. (b)(1).) The jury also convicted Toscano of misdemeanor child endangerment. (§ 237a, subd. (b).) The trial court sentenced Toscano to 25 years to life for the murder, plus a consecutive one-year term for the weapon enhancement and a concurrent 180-day term for the misdemeanor.

DISCUSSION

## A. *Heat of Passion*

Toscano argues that the record does not contain sufficient evidence that he was not provoked to kill Doe in the heat of passion. He argues that Doe's decision to break up with him, together with the evidence of her potential infidelity, constitutes legally sufficient provocation and that his statements during his police interview demonstrate that he was in fact provoked. We disagree.

Faced with a challenge to the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) We do not resolve credibility issues or evidentiary conflicts, as that is "the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Instead, we uphold the conviction " 'unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Cravens*, at p. 508.)

Voluntary manslaughter is the unlawful killing of a human being, without malice, "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) An unlawful killing is voluntary manslaughter only " 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " ' " (*People v. Breverman* (1998) 19 Cal.4th

6

142, 163, overruled in part on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237.) "Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*).) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' " (*Ibid.*) Finally, when heat of passion is at issue during trial, the People must prove the absence of provocation beyond a reasonable doubt. (*People v. Bloyd* (1987) 43 Cal.3d 333, 349; *People v. Franklin* (2018) 21 Cal.App.5th 881, 887-888.)

The record contains substantial evidence of the absence of objective provocation. Contrary to Toscano's contention, Doe's act of ending their relatively brief dating relationship does not constitute legally sufficient provocation. (See, e.g., *People v. Hyde* (1985) 166 Cal.App.3d 463, 473 [The victim's act of dating other people after breaking up with the defendant did not constitute sufficient provocation, regardless of the defendant's "extreme jealousy and preoccupation" with the victim's new partners.]; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1414 [The victim's act of starting another romantic relationship after filing for divorce from the defendant did not constitute sufficient provocation.].) Toscano's reliance on *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*) to show objective provocation is misplaced because that case is factually distinguishable. In *Berry*, the victim told her husband (the defendant) that she had fallen in love with another man during a trip abroad, showed the defendant pictures of her and

the man together, said she might be pregnant with the other man's child, and engaged in a pattern of sexual behavior with the defendant that an expert psychiatrist testified had the effect of "taunting [the defendant] into jealous rages." (*Id.* at pp. 512-514.) Here, by contrast, Doe consistently denied that she was cheating on Toscano—she merely expressed her desire to end their eight-month relationship. A reasonable juror could conclude that a breakup under those circumstances would not cause an ordinary person with an average disposition to be "so inflamed" as to lose reason and judgment. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Moreover, Toscano's subjective belief that Doe was seeing someone else is not legally sufficient provocation to cause the ordinary person of average disposition to act rashly or without due deliberation and reflection.

Because objective provocation is a necessary element of heat of passion, we could end our analysis here. But we also note that there was substantial evidence that Toscano was not subjectively provoked either. Toscano contends that it "was not just a simple romantic breakup," because it came as such a shock to him. But Toscano himself said during his interview that he and Doe had been arguing for months about whether she was cheating on him. Given the ongoing discord in their relationship, the jury could reasonably infer that he was not surprised by Doe's decision to leave him. Additionally, the jury could reasonably infer from his statement that he attacked Doe because he did not want her to "be in another man's arms," that his decision to kill Doe was calculated. By his own admission, before he stabbed Doe, Toscano had the thought that he would rather see her dead than with another man.

Moreover, even if the jurors believed that Toscano was initially surprised and provoked into a heat of passion when Doe told him that she did not want to see him anymore, they could nevertheless reasonably conclude that the time it took him to locate a weapon "represented a distinct and divisible event in the sequence of events and provided him sufficient time to 'cool down.' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 34 (*Middleton*), disapproved of on a different ground by *People v. Gonzalez* (2003) 31 Cal.4th 745; *People v. Breverman*, *supra*, 19 Cal.4th at p. 163 [" '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter.' "].) Toscano makes much over the fact that the photos the police took of Doe's kitchen show that the drawer the knife came from was open. He argues that this means the drawer was already open when he came into the kitchen and thus he was able to grab the knife quickly with no time to reflect. But whether he had to open the drawer before taking the knife is insignificant because the jury could still conclude that the trip to and from the kitchen afforded Toscano sufficient time to cool down, regardless of whether he took the additional action of opening a drawer. (See, e.g. *Middleton*, at p. 34 [defendant's act of going from the front door to the kitchen sink to retrieve a gun provided sufficient time for him to cool down]; *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1170 [defendant's flight from the house to the garage provided sufficient time for him to cool down].)

The jurors were properly instructed on the heat of passion theory of voluntary manslaughter, and it was their job to decide whether the facts and circumstances were sufficient to create a reasonable doubt as to whether Toscano was provoked. The jurors

9

implicitly concluded beyond a reasonable doubt that there was no legally sufficient provocation warranting a reduction to voluntary manslaughter.  We conclude the evidence is sufficient to support that finding.  (*People v. Bloyd*, *supra*, 43 Cal.3d at p. 350.)

B.  *Premeditation and Deliberation*

Toscano argues that there was insufficient evidence of premeditation and deliberation to support his conviction for first degree murder.  Again, we disagree.

First degree murder is any "kind of willful, deliberate, and premeditated killing." (§ 189.)  Deliberation refers to " 'careful weighing of considerations in forming a course of action' " and premeditation means " 'thought over in advance.' "  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)  "[T]he requisite reflection need not span a specific or extended period of time."  (*People v. Nelson* (2011) 51 Cal.4th 198, 213 (*Nelson*).)  The key inquiry is whether the killing "occurred as the result of reflection rather than unconsidered or rash impulse."  (*Ibid.*)  "Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things."  (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*).)

The record contains substantial evidence from which the jury could conclude that Toscano's killing of Doe was the result of reflection rather than impulse.  The evidence at trial revealed that Toscano—who had suspected for months that the victim was cheating on him—became angry when the victim told him she no longer wanted to date him, left her in the backyard to retrieve a knife from the kitchen, returned, and stabbed her to death.  Taken together, those circumstances support the jury's finding of premeditation

10

and deliberation.  (See *People v. Manriquez* (2005) 37 Cal.4th 547, 577 [substantial evidence of premeditation and deliberation where the defendant approached the victim several minutes after they had engaged in a verbal altercation, pulled a gun from his waistband, and shot the victim in the chest].)

Toscano contends that the evidence demonstrates that he was acting impulsively and not as part of a preconceived or careful plan to kill Doe.  In support, he points out that others were home when he attacked Doe, the distance to the kitchen from the back yard was relatively short (approximately 20 feet), and he stabbed Doe so many times (at least 22 times, according to the stipulation).  Toscano's argument asks us to view the record in the light most favorable to him, but the inferences are different when conflicts in the evidence are resolved in favor of the verdict, as the standard of review requires.

For instance, the jury could reasonably draw the opposite inference from the fact that Toscano stabbed Doe over 30 times, concluding instead that the evidence that he targeted the most vulnerable parts of her body suggests a deliberate design to kill. (*People v. Anderson* (1968) 70 Cal.2d 15, 27 ["[P]lunging a lethal weapon into the chest evidences a deliberate intention to kill."]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [The jury could have reasonably "concluded that defendant was intent upon killing [the victim] due to the sheer number of wounds on [her] body, many of which individually would have been fatal."].)  And, although the distance from the backyard to the kitchen was short, the jury could nevertheless conclude that the distance afforded Toscano a sufficient opportunity to form a deliberate plan to kill Doe because "[t]houghts may follow each other with great rapidity, and cold, calculated judgment may be arrived

11

at quickly." (*Nelson*, *supra*, 51 Cal.4th at p. 213.) Additionally, the jury could reasonably infer from Doe's daughter's attempt to stop Toscano by yelling and throwing rocks at him that he was enacting a preconceived design from which he would not be deterred. (*Potts*, *supra*, 6 Cal.5th at p. 1029 ["A theory that a person killed in a fit of rage is undermined by proof that, after ample opportunity for reflection, the person decided that continuing a violent attack was appropriate."].)

Moreover, Toscano's conduct after the killing is inconsistent with a rash, impulsive killing. Although he asked during his police interview if Doe might still be alive, Toscano did not try to render aid, call 911, or otherwise seek out medical assistance for her. The jury could reasonably infer from the fact that he left Doe bleeding on the ground outside in the dark that he was carrying out a deliberate plan to kill her. (*People v. Disa* (2016) 1 Cal.App.5th 654, 667 [The jury may consider the "defendant's conduct after the killing in relation to the manner of killing."].) Finally, the jury could reasonably conclude that Toscano had a motive to kill Doe from his statements that he was "very jealous," that he had been suspecting Doe of cheating on him for months, and that "did it" because he did not want Doe "to be in another man's arms." (*People v. Brooks* (2017) 3 Cal.5th 1, 59, 66 [Evidence that the defendant had become "increasingly jealous and possessive of" the victim in the months before he killed her was evidence of motive and supported a finding of premeditation and deliberation.].)

For all of these reasons, we conclude that the record contains substantial evidence to support Toscano's conviction for first degree murder.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
Acting P. J.

We concur:

RAPHAEL
J.

MENETREZ
J.

13