Filed 4/23/15  P. v.Barreno CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CELSO GERRARDO BARRENO,<br><br>    Defendant and Appellant. | D066867<br><br><br><br>(Super. Ct. No. FSB 277635) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Victor Roy Stull, Judge.  Affirmed.

Patrick Morgan Ford, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Celso Barreno shot and killed a man in San Bernardino, California in 1992.  More than 18 years later, he was arrested at an El Paso, Texas border crossing while attempting to reenter the United States from Mexico.  A jury convicted Barreno of first degree murder

(Pen. Code, § 187, subd. (a)[1]; count 1) and found true the special allegation he personally used a shotgun to commit the offense (§§ 1203.06, subd. (a)(1)(A), 12022.5, subd. (a)).  On appeal, Barreno contends (1) there was insufficient evidence to support the first degree murder conviction, (2) the trial court erred in failing to instruct the jury regarding voluntary manslaughter as a lesser included offense of murder, (3) a court-imposed procedure for impeaching witnesses violated his Sixth Amendment right to confront and cross-examine witnesses, and (4) he was denied a fair trial by the pre-accusation delay.  Finding no merit in any of these contentions, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

In 1992, Barreno stayed several days a week with his brother's girlfriend, Iris Amador,[2] to help with her son because Barreno's brother was incarcerated.  Their apartment was in a duplex, next door to the apartment Ricardo Ramirez shared with his wife.  The apartments shared a common wall.

On the evening of September 4, 1992, Ramirez and an acquaintance, Frank Gamboa, gave Amador a ride to go out partying.  Amador did not return home until the following day.

---

[1]     Statutory references are to the Penal Code unless otherwise indicated.

[2]     Amador used the name Iris Lopez at the time of trial.  Although she was never married to Barreno's brother, she referred to Barreno as her brother-in-law.

B

At approximately 2:00 the following morning, September 5, 1992, Ramirez stood outside his home talking to a friend while Gamboa replaced the engine coil in Ramirez's 1954 Chevrolet. Ramirez removed the engine coil to prevent the car from being stolen. Gamboa was replacing it so they could take a drive to get more beer.

Gamboa was leaning under the hood of the car when Ramirez saw Barreno, wearing a long black jacket, walk down the driveway holding a 12-gauge pistol grip pump action shotgun. Barreno stopped approximately 20 feet from Gamboa, yelled "Gamboa. Gamboa," and then shot toward him. Ramirez, who had turned his head to look at Gamboa, heard the blast and saw Gamboa start running and screaming.

Ramirez saw Barreno's gun go down and then start to come back up again as Barreno turned in the direction of Ramirez and his friend. Ramirez heard the sound of the gun reloading as he ran toward the door of his apartment. Ramirez heard a second shot and felt a burning pain in the back of his left leg as he reached the door. Ramirez went into the kitchen, turned off the lights and looked out of the window. He saw Barreno standing at the end of the driveway with the shotgun in his hand. Barreno then walked back toward Amador's apartment, where Ramirez had seen Barreno go on several occasions.

Ramirez squeezed a pellet out of his leg from where it was embedded in his skin. He then ran out to look for Gamboa. When he did not see Gamboa on the street, Ramirez ran to Gamboa's sister's house, but did not find him. Ramirez did not return home for several days because he was afraid of retaliation from Barreno.

3

A police officer found Gamboa half a block away. Gamboa was still alive, but the officer saw he had a chest wound and felt Gamboa would likely die of the injuries. When the officer asked who shot him, Gamboa said he did not know. He said a group of juveniles wearing trench coats walked past him as he was walking down the street, he heard someone yell his name, "Gamboa" and then he was shot. Gamboa said he did not see the person who shot him. The officer did not believe Gamboa was telling the truth. The officer documented seven entry wounds on the chest and eight to 10 entry wounds on the lower back, near the kidney. The officer concluded there were two separate shotgun blasts based on the location of the wounds.

Gamboa died at the hospital. The medical examiner determined Gamboa's cause of death was shotgun wounds to the chest and abdomen, with death within hours. The medical examiner found two clusters of pellets with different trajectories, consistent with two shotgun blasts.

C

An officer responding to the scene interviewed witnesses at the duplex complex and identified Barreno as a suspect. When the officer knocked on the door where he was told Barreno lived, there was no answer.

After obtaining a warrant, the police entered the apartment and located a shotgun behind a dresser in the room Barreno used in Amador's apartment. The police also recovered a black jacket from the bathroom. The shotgun contained two live shells in the barrel and a spent round in the chamber. Another expended shotgun shell casing was

4

previously recovered on the driveway, east of where the car was parked on the street.  A

third spent shell was found on a shelf in the bedroom where the shotgun was recovered.

A firearm specialist employed by the San Bernardino Crime Lab opined all three

spent or shot shells had at one time cycled through the shotgun located in the apartment

and were possibly fired from the shotgun.  The live rounds were consistent with the fired

casings.  The casings held 12 "00 buck" shotgun pellets, which are large for shotgun

pellets.  They are used for shooting large objects.  These casings were longer than typical

casings, which hold nine pellets.

Ramirez spoke to police officers several days after the incident and identified

Barreno from a photographic line-up as the shooter.  Ramirez reported Barreno was upset

with Gamboa for being verbally disrespectful to Amador about a week before the incident

when Gamboa confronted her about spreading gossip.[3]

D

The local police were unable to locate Barreno over the following years.  In 2007,

one of the responding officers, who had since joined a fugitive task force team, was asked

to look at this case and locate Barreno, for whom there was an outstanding arrest warrant.

The officer searched government records and national databases for Celso Gerrardo

Barreno.  He noted that although there were various contacts for this individual leading up

to September 5, 1992, they abruptly stopped after that date.  The officer came to the

---

[3]     Amador denied she told police about an argument between either her and Gamboa
or Gamboa and Barreno before the murder.  She testified she only met Gamboa on the
evening of September 4, 1992.  She did not recall telling the police Gamboa was a frequent
visitor with her neighbors.  She admitted she did not want to testify against Barreno.

conclusion Barreno was either dead or out of the country.  He went through procedures with the federal government to place an alert at border crossings to notify him if Barreno tried to cross the border from Mexico.

In 2011, the officer received notification Barreno had been detained and taken into custody when he crossed the border using the name Celso Barreno-Nuñez.  Arrangements were made to extradite him from El Paso, Texas to California.  Barreno reported he had been living in Chihuahua, Mexico for the past 18 1/2 years.  He was married and had worked as a pastor for eight and a half years.

E

The jury found Barreno guilty of first degree murder of Gamboa and found true the special allegation he personally used a firearm (i.e. a shotgun) in the commission of the offense.  The jury found Barreno not guilty of attempted murder (§§ 187, subd. (a), 664; count 2) of Ramirez.

The trial court denied Barreno's motion for new trial raising the same issues as those raised on appeal.  The court sentenced Barreno to state prison for four years for the firearm enhancement (§ 12022.5, subd. (a)) plus the statutory term of 25 years to life for first degree murder (§ 187).

DISCUSSION

I

*Sufficiency of the Evidence for First Degree Murder*

A

When we review a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine if there is substantial evidence from which any reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) Because it is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts or inconsistencies, we presume the existence of every fact the jury could reasonably deduce from the evidence to support the judgment. (*Ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1175, 1181.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Nelson*, *supra*, at p. 210.) We apply the same standard in determining the sufficiency of the evidence to establish premeditation and deliberation as elements of first degree murder. (*People v. Silva* (2001) 25 Cal.4th 345, 368.)

B

Murder is the "unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) A willful, deliberate and premeditated killing is first degree murder. (§ 189.) " ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of

7

considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" [Citation.] " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' [Citation.]" [Citations.]' "  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).)

The Supreme Court has identified "three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation."  (*Mendoza*, *supra*, 52 Cal.4th at p. 1069, citing *People v. Solomon* (2010) 49 Cal.4th 792, 812; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  This is not an exhaustive list and does not " ' "exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." ' "  (*Mendoza*, *supra*, 52 Cal.4th at p. 1069, quoting *People v. Solomon*, *supra*, at p. 812.)

In this case, the evidence of motive, planning and manner of killing support the jury's finding of premeditation and deliberation.  Ramirez said Barreno was upset at Gamboa for speaking disrespectfully to Amador about a week before the incident.  Yet, Barreno did not act rashly.  He waited until the evening of September 4, 1992, after Amador left to go partying and arrangements were made for Amador's child to be cared for by someone else because Barreno also planned to go somewhere that night.

At approximately 2:00 a.m., Barreno, dressed in a long black jacket, carried a black 12-gauge pistol grip pump-action shotgun as he walked down the driveway toward where Gamboa was working on a car.  Barreno stopped, shouted "Gamboa[,] Gamboa," and shot

8

at Gamboa. As Gamboa and the witnesses ran away, Barreno reloaded or "racked" the gun and fired a second shot.[4]

The gun was loaded with shotgun shell casings holding "00 buck" shotgun pellets. Each pellet is about .32 caliber, which are large anti-personnel shotgun pellets. The casings hold 12 shotgun pellets rather than the typical nine, which increased the chance of hitting a target moving away from the gun. Gamboa died as a result of multiple shotgun wounds to the chest and abdomen, which damaged his spleen, liver, and diaphragm and reached his heart. These wounds were consistent with two shotgun blasts.

After the shooting, Barreno walked back to Amador's apartment, hid the gun behind a dresser in the bedroom he used, left the jacket behind, and went to Mexico where he stayed for the next 18 and a half years.

---

[4] Barreno contends on appeal the evidence showed he fired a single shot at Gamboa and then shot toward Ramirez. However, this is not the only reasonable inference from the evidence. Ramirez testified he was standing inside the fence of his yard, which is on the right side of the driveway of the duplex complex when looking at the complex from the street. He was standing on the left side of his yard near a fence post and was facing the street. He saw Barreno walk down the driveway from his right. When he saw the gun, he turned his head to the left where Gamboa was working under the hood of the car and heard the first shot. Gamboa screamed and ran down the street. Gamboa was found on a doorstep at the first intersection south of where the shooting occurred, indicating he ran away from Barreno to the south. When Ramirez saw Barreno turn in his direction, Ramirez ran to the side door of his apartment, which would also be south, heard the second shotgun blast and felt a pellet enter his leg. The jury reasonably could have concluded Barreno fired a second shot at Gamboa as he ran away down the street in a southerly direction and a pellet from the second blast caught Ramirez in the leg as he was running in the same direction. This interpretation of the evidence is consistent with the jury's finding Barreno was not guilty of attempted murder of Ramirez and finding not true the special allegation that Barreno used a shotgun in the attempted murder of Ramirez.

9

The choice of weapon and the manner of the shooting in this case, shooting Gamboa twice in the abdominal and chest areas with a shotgun, indicate a deliberate intent to kill. (*Mendoza*, *supra*, 52 Cal.4th at p. 1071 [manner of killing was not rushed or panicked but reflected stealth and precision]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [shooting of victims in head or neck from within feet is "a method of killing sufficiently ' "particular and exacting" ' to permit an inference that defendant was 'acting according to a preconceived design' "]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [shooting a vital area of the body at close range indicates deliberate intent to kill].) We conclude there is sufficient evidence to support the jury's verdict of first degree murder.

II

*Jury Instruction*

The trial court in this case instructed the jury regarding both first and second degree murder. Barreno contends the court erred in failing to sua sponte instruct the jury on voluntary manslaughter as a lesser included offense of murder. He contends there was evidence to support a manslaughter theory because Barreno was upset with Gamboa for making disrespectful remarks to Amador. He argues this showed the shooting was based on emotion rather than reflection. We disagree.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most

10

accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.]  In light of this purpose, the court need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense. [Citation.]' "  (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404.)  However, "the existence of *'any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury."  (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

Murder is the unlawful killing of a human being with malice aforethought (§ 187, subd. (a)), whereas voluntary manslaughter is an intentional and unlawful killing, but without malice (§ 192).  (*Breverman*, *supra*, 19 Cal.4th at p. 153.)  " 'Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder.' "  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

Barreno contends the court should have instructed on voluntary manslaughter based on a heat of passion theory.  "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.] '[T]he factor which

11

distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*Moye*, *supra*, 47 Cal.4th at pp. 549-550.)

For the subjective element, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Moye*, *supra*, 47 Cal.4th at p. 550.) However, if " 'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter —"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation]' [Citations.] Thus it is insufficient that one is provoked and later kills." (*People v. Beltran* (2013) 56 Cal.4th 935, 951.)

In this case, there is no evidence Barreno acted in the heat of passion to support a jury instruction regarding voluntary manslaughter. There was no objective evidence of provocation. There was evidence Barreno was upset at Gamboa for a disrespectful

12

statement to Amador, which may have motivated the killing. However, a motive for killing is distinguishable from the emotion necessary for the heat of passion defense. (See *People v. Hyde* (1985) 166 Cal.App.3d 463, 473.) There was no evidence in this case of what Gamboa said to Amador or that the statement would give rise to objective provocation. Nor was there evidence the relationship between Barreno and Amador was so close or intimate that a disrespectful comment would be sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (See *People v. Le* (2007) 158 Cal.App.4th 516, 525 [husband killed wife's lover in a fit of rage]; *People v. Berry* (1976) 18 Cal.3d 509, 515 [verbal taunts by a unfaithful wife].)

Additionally, there was no evidence Barreno killed Gamboa while under the actual heat of passion. The statement, whatever it was, was made a week or more before the killing. Barreno waited until after both Amador and her son were out of the apartment on the morning of September 5, 1992, before confronting Gamboa. He walked down the driveway wearing a black jacket to conceal the black shotgun. He called Gamboa's name twice, fired one shot, reloaded and shot again as Gamboa ran away. He then stood in the driveway before turning around and walking back to the apartment where he hid the weapon before leaving for Mexico. None of this evidence suggests Barreno acted in the heat of passion or under such intense emotion that his reason was obscured. We conclude, therefore, there was no substantial evidence to allow a reasonable jury to conclude the killing of Gamboa constituted voluntary manslaughter.

III

*Trial Procedure*

Barreno next contends the trial court's impeachment procedure deprived him of his constitutional right, under both the state and federal constitutions, to confront and cross-examine Ramirez. We do not agree.

A

We begin with the established principle that a trial court has a duty "to control all proceedings during trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) It also has broad discretion to control the mode of witness examination (Evid. Code, § 765), and to determine the relevance of evidence and weigh the prejudicial effect of evidence against its probative value. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1385.) Appellate courts review a trial court's evidentiary rulings and rulings regarding order of proof for abuse of discretion. (Evid. Code, § 320; *People v. Tafoya* (2007) 42 Cal.4th 147, 175; *In re Ryan N.*, *supra*, at p. 1385.)

A criminal defendant has a constitutional right under the Sixth Amendment to the United States Constitution and under article I, section 15 of the California Constitution to confront and cross-examine the witnesses against him. The state and federal rights are identical. (*People v. Contreras* (1976) 57 Cal.App.3d 816, 820.) "A criminal defendant states a violation of the confrontation clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias on the part of the witness, and thereby to expose facts from which the jury could appropriately draw

14

inferences relating to the reliability of the witness. [Citations]. [¶] Nevertheless, a trial court retains broad discretion over the conduct of trial." (*In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1385.)  " '[T]rial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or, interrogation that is repetitive or only marginally relevant.' " (*Ibid.*)

A limitation on cross-examination does not violate the confrontation clause " 'unless the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness's] credibility. . . " [Citation.].' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 780, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  "As long as the cross-examiner has the opportunity to place the witness in his or her proper light, and to put the weight of the witness's testimony and credibility to a reasonable test which allows the fact finder fairly to appraise it, the trial court may permissibly limit cross-examination to prevent undue harassment, expenditure of time, or confusion of the issues." (*In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1386.)  "[T]he [c]onfrontation [c]lause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [106 S.Ct. 292, 88 L.Ed.2d 15] (per curiam).)

A defendant's constitutional right to present a defense is not unlimited.  The due process right to present a defense requires that a defendant be able " 'to present all relevant

15

evidence of *significant* probative value to his defense.' " (*People v. Babbitt* (1988) 45 Ca1.3d 660, 684.) "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Ca1.4th 1075, 1102-1103.)

B

In this case, during cross-examination of Ramirez, Barreno's counsel challenged Ramirez's testimony about the incident occurring at 2:00 a.m. Barreno's counsel used a document to refresh Ramirez's recollection about what he told an investigating officer about the time of day the shooting occurred. When counsel asked Ramirez to review the interview report, the court clarified, "You're just going to use it to refresh your recollection rather than impeach; is that correct?" The court then explained the procedure it expected counsel to follow for impeachment: "[I]f you're going to impeach the witness, I want to see the writing, I want counsel to have it, I want you to refer both of us to the writing, the specific section after you've asked your question so if there's an objection we can rule upon it in an abeyance of an answer coming in which I may have to strike."

After acknowledging the report refreshed his recollection, Barreno's counsel asked Ramirez, "And isn't it true that you told [the investigating officer] the shooting occurred when it was just getting dark?" The prosecutor objected to the question as misstating the report. The court further explained, "I want you to give me something in writing that you're going to use to impeach and direct me to the specific line, paragraph, sentence or whatever, and then ask the question and we'll see if there's an objection." Barreno's counsel provided the document. After reviewing the document, the court sustained the

16

prosecutor's objection to counsel's paraphrase of the report because it did not accurately reflect the statement in the report that the witness "believed" it was just after dark.  Later, however, Barreno's counsel used the police report to get Ramirez to admit he could have told the investigating detective he believed it was just getting dark at the time of the shooting.

When Ramirez testified the incident occurred five minutes after a friend arrived at his apartment, Barreno's counsel asked "Do you remember testifying at the preliminary hearing that your friend . . . arrived there at midnight?"  The prosecutor objected to the question as improper impeachment.  When the court again clarified the procedure, Barreno's counsel provided a copy of the preliminary hearing transcript and cited the page and line number.  After reviewing the referenced document, the prosecutor had no objection and Barreno's counsel proceeded to impeach Ramirez with his preliminary hearing testimony in which he stated the friend arrived just after midnight.

The court applied the procedure to the prosecutor's questioning as well.  When Amador testified Barreno did not keep clothes at her apartment, the prosecutor asked "Did you tell the police that Celso had clothes and other property there?"  Barreno's counsel objected to the question as improper impeachment.  The court overruled the objection, but asked the prosecutor for the document reference and reiterated the need to alert the court and counsel to the prior statement to allow a chance to object.  After Barreno's counsel was given an opportunity to review the document, the prosecutor asked the question again and the court overruled the objection.

When the prosecutor asked Amador if she told police there was an argument between Gamboa and Barreno in the weeks before the incident, Barreno's counsel objected. The court noted this first question was not impeachment. When she denied there was an argument between Gamboa and Barreno, the prosecutor referred to a page and paragraph in a police report produced in discovery. When Amador said the document did not refresh her recollection, the prosecutor provided a copy to the court.

The prosecutor asked Amador about other things she told the police. When she said she did not recall, the prosecutor provided a copy of the police report, giving a page and paragraph reference, and asked if it refreshed her recollection. When the prosecutor began reading hearsay portions of the police report into the record (ostensibly to orient the witness to the referenced portion of the report), the court admonished the prosecutor in front of the jury to abide by the process for prior inconsistent statements and to avoid reading hearsay statements to the jury. The court allowed the prosecutor to ask if Amador told the police Gamboa was a frequent visitor to her neighbors and if that was inconsistent with her testimony she met Gamboa the day before the shooting. She said she did not remember. At a break, the court advised the prosecutor to tone down his cross-examination of Amador and admonished him to follow the impeachment procedure by giving a copy of any writing used for impeachment to the court and counsel. The court stated it was not going to impose one rule for Barreno's counsel and another for the prosecution.

Based on the record before us, we cannot conclude the court abused its discretion in requiring counsel to provide the court and opposing counsel with a copy of a document used for impeachment before proceeding with the impeachment inquiry. This procedure gave each attorney an opportunity to review the document and object if necessary. The fact some objections were sustained and some were overruled based on the form of the question does not demonstrate prejudicial abuse of discretion.

Barreno does not contend the court prohibited a line of appropriate inquiry or precluded his counsel from exposing facts from which the jury could draw inferences relating to the reliability of the witness. (*In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1385.) To the contrary, the record shows Barreno's counsel effectively cross-examined Ramirez's testimony by exposing the differences in his statements at trial and those made years earlier to police. In denying the motion for new trial, the court stated, "My recollection of the trial itself is that with respect to cross-examination of the IDing, identifying witness, is that [defense counsel] did everything except walk up to the witness stand and beat him over the head with a ball bat. His cross-examination was relentless. He made, in my estimation, every telling point that he could with respect to the identifying witness to impeach him in any way he could. And I thought he did an effective job in doing it." Therefore, even if the court's application of its procedure was an abuse of discretion, any error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836-837.)

## IV

### *Delay in Prosecution*

Lastly, Barreno contends he was denied a fair trial by the 18-plus-year delay between the incident in 1992 and his arrest 2011. We find no merit in this contention.

Barreno does not contend his state and federal constitution speedy trial rights are implicated. However, " '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' " (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.) "The balancing task is a delicate one, 'a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. [Likewise], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.' " (*People v. Boysen* (2007) 165 Cal.App.4th 761, 777.) Prejudice from such a precharging delay is not presumed. (*People v. Abel* (2012) 53 Cal.4th 891, 908-909.)

"Whether preaccusation delay is unreasonable and prejudicial to a defendant is a question of fact. [Citation.] If the trial court concludes the delay denied the defendant due process or his constitutional speedy trial rights, the remedy is generally dismissal of the charge. [Citations.] . . . [Citation.] [¶] We uphold the trial court's ruling or decision on appeal if it is supported by substantial evidence. [Citation.] Moreover, '[w]e may sustain

20

the trial court's *decision* without embracing its *reasoning*.' [Citation.] If the court's ruling or decision is ' " ' " right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " ' " (*People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1330.)

In this case, after considering the moving and opposition papers, along with police reports of pertinent witness statements, the trial court found Barreno did not show either unreasonable delay or prejudice. Even though some witnesses were deceased at the time of trial and others could not be found, the court concluded Barreno did not show prejudice. The court observed that one of the deceased witnesses, Ramirez's sister, said she heard gunshots and fell to the floor but did not see anything. Her boyfriend looked outside and reportedly saw Barreno with a gun. The court concluded Ramirez's sister's testimony would be inadmissible hearsay as to the boyfriend's statements. The boyfriend, also deceased, initially told the police he did not see anything and later told the police he did not see anything in the hands of the person he saw out the window.

Another witness who could not be located at the time of trial told the initial investigating officer she was awakened by gun shots. As she screamed for someone to call 911, she looked out the window and saw Barreno standing in the driveway and smiling as he looked toward her apartment. He started walking to his residence and said something to the effect of "Yeah, call 911." She reported he was wearing a jacket, but she did not see a gun. In a second interview, this witness said Barreno was carrying a shotgun next to his left leg and was walking in an effort to hide it. The court noted the testimony of these witnesses arguably could contradict Ramirez's testimony about Barreno holding a gun, but

21

did not find the absence of their testimony prejudicial because they were not as valuable as Barreno claimed.

However, even presuming prejudice did result from the delay, the court concluded Barreno was aware or should have been aware charges would be filed against him and law enforcement made reasonable efforts to locate Barreno under the name he was known to them and did not delay arrest to gain a tactical advantage. The court noted it was logical to conclude Barreno immediately fled to Mexico after the murder or "effectively hid his identity and place of residence" to avoid arrest.

After weighing the alleged prejudice against the justification for the delay, namely Barreno's flight to Mexico for over 18 years, the court denied the motion. "To find it a due process violation under these circumstances would turn the due process clause on its head and deny Mr. Gamboa's family, and the People of California, their own right to due process." We agree with the trial court's analysis.

This case is distinguishable from *Jones v. Superior Court* (1970) 3 Cal.3d 734 (*Jones*), a case relied upon by Barreno. In *Jones,* the defendant knew the police were looking for him and, in a telephone call, an officer asked him to come to the police station to discuss a narcotics issue. (*Id*. at p. 737.) Even though the police department knew the defendant's name and address, they made no attempt to arrest him for 19 months. Under the circumstances of that case, the court concluded the defendant was under no legal obligation to go to the police station and there was an unreasonable delay in apprehending him since he was not in hiding and a routine investigation could have discovered his whereabouts. (*Id.* at p. 741.)

22

In contrast, Barreno immediately fled the scene of the crime and went to Mexico where he stayed for more than 18 years. The police interviewed family members looking for Barreno in 1992 after the incident. Over the years, law enforcement attempted to reinterview witnesses to determine Barreno's whereabouts and conducted ongoing searches, including alerting task forces used to apprehend felony suspects. In 2007, one of the initial investigating officers, who was then assigned to the Federal Bureau of Investigation conducted a nationwide search for Barreno and placed Barreno's warrant information in the Homeland Security system for border crossings. Ultimately, Barreno was apprehended when he attempted to cross the border from Mexico into Texas in 2011. The Supreme Court has made clear a trial court " 'may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. " . . . Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay. . . ." ' " (*People v. Abel*, *supra*, 53 Cal.4th at p. 911.) [5] Given the circumstances of this case, we cannot conclude the trial court abused its discretion in denying the motion to dismiss.

---

[5] The facts of this case are also dissimilar to *Rice v. Superior Court* (1975) 49 Cal.App.3d 200, 203-204, where a clerk failed to transmit warrant information to local law enforcement and those who knew of the indictment only made periodic checks with the defendant's mother even though the defendant had moved to a nearby city and was in contact with numerous public agencies. In that case, the court concluded the obvious negligence of the government caused an unreasonable delay. (*Id*. at p. 205.)

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.