Filed 6/7/16  P. v. Goodwin CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067547 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235172) |
| DENISE MICHELLE GOODWIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Denise Goodwin guilty of the first degree premeditated murder of an 88-year-old man and found true the special circumstance allegation that she committed

the murder for financial gain. The jury made these findings despite that the victim's body had never been located. The jury also found Goodwin committed numerous theft/fraud crimes against the murder victim, the murder victim's wife, and another unrelated elderly victim. The court sentenced Goodwin to life without the possibility of parole for the murder conviction plus four years for one of the theft convictions. The court stayed the sentence on the remaining convictions.

On appeal, Goodwin challenges the first degree murder conviction. Focusing on the absence of the victim's body, Goodwin contends insufficient evidence supported the jury's findings that she committed an act resulting in the victim's death, that she committed the crime with malice, and that she acted with the requisite premeditation and deliberation. These contentions are without merit. The absence of the murder victim's body did not preclude a first degree murder conviction because strong circumstantial evidence supported the jury's finding that Goodwin killed the victim and did so with the requisite malice and premeditation/deliberation. We affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY

At trial, the prosecution presented evidence showing Goodwin used her position as a caregiver to obtain control of 88-year-old Gerald Rabourn's (Gerald) assets, and then she killed him to ensure the continued success of her criminal scheme to acquire title to Gerald's property.[1] Gerald's body was never found and there was no physical evidence of his death. The trial lasted about one month. The prosecutor called more than 75

---

[1]    We use first names in the opinion to minimize confusion and enhance readability.

witnesses and presented hundreds of exhibits. Goodwin did not testify, but called several character witnesses who testified that she is a nonviolent person.

To explain our evaluation of Goodwin's sufficiency-of-the-evidence challenge, it is necessary that we summarize the circumstantial evidence in some detail. Because Goodwin challenges solely the jury's murder findings, we discuss the facts underlying the theft/fraud charges only to the extent they are relevant to the murder conviction.

## A. *Prosecution Case*

### 1. *Victim Seward Norris: 2006 through 2010*

In 2006, 38-year-old Goodwin lived with her mother, Helen Lock, in a rural area of Valley Center in northeastern San Diego County. Lock operated a business that provided fiduciary services, and Goodwin worked with her. At various times in 2006 through 2008, an elderly man (Seward Norris) lived in Lock's home or in a trailer on the property. Norris sometimes paid Goodwin about $7,000 per month for caregiver services and expenses.

By late 2008, Norris suffered from moderate to severe dementia. In November 2009, Goodwin contacted Norris's life insurer and requested a surrender of the account. After Goodwin represented herself on the telephone as Norris's daughter or granddaughter, the insurer mailed a $44,562.39 check to Goodwin. Goodwin deposited the check into Norris's bank account after adding her own name to the account. Goodwin then used the money for her own benefit.

Norris died in mid-2010.

3

## 2. *Goodwin's Plan to Meet Dependent Seniors*

Within several months of Norris's death, 44-year-old Goodwin placed advertisements on two online dating sites. On one of the sites, Dating4Seniors.com, Goodwin described herself as a 74-year-old woman looking for an older man. On the other site, SugarDaddy4me.com, Goodwin said she was looking for a "sugar daddy" between the ages of 72 and 88 to take care of her.

When these efforts proved unsuccessful, Goodwin applied for a caretaker job with Comforcare, an entity that provides support to seniors living independently in their homes. Goodwin submitted false educational information and listed Lock as a reference, without disclosing that Lock was her mother. After Lock gave a glowing reference, Comforcare hired Goodwin. Goodwin specifically requested to work with hospice cases.

## 3. *Goodwin's Caregiving Work for Carolyn Rabourn*

As Goodwin's first assignment, Comforcare placed Goodwin with a hospice client, 91-year-old Carolyn Rabourn (Carolyn), who lived with her 88-year-old husband (Gerald) at their home in a Rancho Bernardo senior community. Carolyn was dying of lung cancer.

This was the second marriage for both Rabourns; they had been together since about 1980 after both of their spouses had died. They each had two adult children, all of whom lived out of state. Gerald had a loving relationship with his daughter Mary who is a chaplain in Kansas City. Gerald and Mary spoke on the telephone frequently, but they saw each other only about once every two years. Gerald also had a good relationship with his stepson Ralph Scobey, Carolyn's son. Gerald's existing trust named Mary as the

4

sole beneficiary of his estate (if he survived his wife) and named Mary as his successor trustee.

Goodwin began working for Carolyn in mid-September 2010. Within two weeks, Goodwin began stealing from the Rabourns. On September 27, Goodwin used Carolyn's credit card to make purchases of more than $5,000, including about $4,000 worth of video equipment for herself. The next day, September 28, Goodwin opened new checking and savings accounts at Chase Bank (the Rabourns' bank), listing herself and Gerald as joint account holders. Goodwin also called Charles Schwab, with whom the Rabourns had an investment account of more than $143,000. Posing as Carolyn, Goodwin discussed the funds in the account.

The next day, on September 29, Carolyn died. That same day Goodwin transferred about $44,000 from the Rabourns' Chase accounts into the new joint checking account.

### 4. *Goodwin's Activities After Carolyn's September 29 Death*

After Carolyn's death, Comforcare's services for the Rabourns ended. Goodwin then left Comforcare's employment, but continued working privately for Gerald. Goodwin told Gerald she would not charge him for her services. Goodwin presented herself as a professional who knew how to take care of elderly people. She appeared highly competent and was very friendly.

Gerald was a "small man" and weighed about 120 pounds. He was in relatively good health, except that he was very hard of hearing. He was "[e]xtremely health conscious," and would take numerous vitamins every day. He was mentally sharp for his

5

age, but was gullible, emotional, passive, and dependent on others. He had relied on Carolyn to take care of him regarding domestic tasks and had some reading disability issues. Gerald was extremely frugal and protective of his money, and monitored his bank accounts. He had little or no social contacts, and spent most of his days at home doing exercise or watching television.

Gerald was extremely upset when Carolyn died. He had originally planned to live with his daughter Mary (the chaplain in Kansas City) after his wife's death. But soon after Carolyn's death, he told Mary not to come to San Diego to help him with the move. Gerald said he had decided to delay the move because he liked the "wonderful" job that Goodwin appeared to be doing for him.

One day after Carolyn's death, on September 30, Gerald signed a quitclaim deed to his house, giving Goodwin (as trustee) title to his house. On that same day, Goodwin called Schwab (with Gerald's apparent permission) and discussed how to withdraw or transfer the assets from the account now that Carolyn had died.

Four days later, on October 4, Goodwin called an estate planning attorney (Jay Henderson) who had offices nearby and scheduled an October 6 meeting to discuss Gerald's estate plan. At the October 6 meeting, Goodwin was introduced as Gerald's "friend and caretaker." Gerald told Henderson he wanted his daughter Mary to remain the sole beneficiary of his assets upon his death, but said he wanted to amend the trust to make Goodwin, rather than Mary, the successor trustee. Henderson testified that Gerald appeared mentally competent, and did not appear to be improperly influenced by Goodwin. Gerald did not tell Henderson about the quitclaim deed to Goodwin.

6

Henderson testified that if he had been aware of the deed or that the two had plans to comingle Gerald's funds, he would have had concerns.

Several days later, on October 12, two Adult Protective Service (APS) workers went to Gerald's house after a concerned neighbor triggered the neighbor's daughter (a district attorney investigator) to report the neighbor's suspicions regarding Goodwin's conduct and motives. Goodwin answered the door, gave a false name, and lied about her activities with Gerald. She at first refused to allow the workers to speak with Gerald, saying he was resting. But when the workers insisted, she brought him to the door after first speaking with him for a few minutes. Gerald told the workers that he was fine.

Two days later, on October 14, Gerald signed and had notarized his amended trust, naming Goodwin as the successor trustee. That same day, real estate agent Lori Cagle met with Gerald and Goodwin, and Goodwin signed a listing agreement for Cagle to market and sell Gerald's house. Goodwin said she was the trustee of Gerald's trust.

On that same date, the APS workers went back to Gerald's house and met with him and Goodwin. Gerald appeared mentally competent and did not want to discuss his finances with the workers.

The next day (October 15), Gerald went to his podiatrist and picked up a prescription at the pharmacy.

Three days later, on October 18, Gerald signed a document resigning his role as trustee of his trust, making Goodwin the sole trustee. Gerald also saw his dermatologist, where he had a biopsy procedure on his arm that required about 20 sutures.

7

The day after that, on October 19, Goodwin recorded the quitclaim deed for Gerald's house. That same day, a change of address card was signed, stating that all of Gerald's mail should be forwarded to a mailbox owned by Goodwin. Gerald also made two phone calls. He called APS and told APS to leave him alone. He used language that appeared to be unusual for an elderly individual, including threatening to obtain a protective order if the APS workers tried to contact him again. He then called his daughter Mary and said he would not be moving to Kansas until after the winter. Mary never spoke to Gerald again.

By this time (within three weeks of Carolyn's death), Goodwin had obtained legal authority over all of Gerald's bank and investment accounts. Goodwin also charged amounts to Gerald's credit cards for items like restaurant and bar tabs, and she deposited a forged $8,000 check in Gerald's name into her own account.

One day later, Gerald placed a phone order for vitamins. This October 20 phone call was the last time anyone (other than Goodwin) had contact with him.

### 5. *October 21: Likely Date of Death*

On October 21, Gerald signed a check to his health insurer; this was the last check Gerald wrote or signed. The only person who had contact with Gerald on October 21 was Goodwin. Specifically, between about 10:56 a.m. and 11:03 a.m., Goodwin made calls from her cell phone to Gerald's cell phone and home phone. About 90 minutes later, at 12:31 p.m., a three-minute call was made from Gerald's cell phone (located at his house) to Goodwin's cell phone. Cell tower records indicated Goodwin was somewhere in the Poway area (about 15 miles southeast of Rancho Bernardo). About 45 minutes

8

later, a call from Goodwin's cell phone to Gerald's cell phone showed that Goodwin was at or near Gerald's house. A few minutes later, in a series of calls from 1:25 p.m. to 3:05 p.m., Goodwin's cell phone accessed a cell tower that provided service to someone located in the rear area of Gerald's house.

Ten minutes later, at 3:14 p.m., a woman who claimed she was Gerald's wife called Gerald's dentist from his home phone to cancel a November 10 appointment, saying they were going on vacation. Eight minutes later, cell tower records showed Goodwin's cell phone was used at Gerald's house. For the next hour, there was no activity on Goodwin's cell phone. Then, between 4:26 p.m. and 5:20 p.m., there were multiple calls on Goodwin's cell phone putting her in the vicinity of her Valley Center residence.

About 90 minutes later, at 6:52 p.m., cell tower records showed Goodwin made a call just north of Gerald's house. Nine minutes later, an incoming call to Goodwin's cell phone reflected an Escondido location, indicating Goodwin was traveling north. At 7:38 p.m., Goodwin's phone accessed a different tower in Escondido reflecting continued northerly travel. For the next hour, Goodwin's phone repeatedly accessed towers in Escondido. By 8:50 p.m., Goodwin's phone was back to accessing the tower near her Valley Center house.

### 6. *After October 21*

As of October 21, all signs that Gerald was alive ceased. He never went back to his dermatologist to have the sutures removed and he stopped picking up his pharmacy prescriptions. Although he had been regularly speaking with his daughter Mary and his

9

stepson Ralph, they never spoke with him again. Gerald's home phone went from averaging four or five outgoing calls each day to no calls. Goodwin also abruptly stopped calling Gerald. Similarly, apart from automatic transactions, there was no activity on Gerald's credit card after October 21.

One day after Gerald was last seen, on October 22, Goodwin's realtor (Cagle) had a lockbox placed on the front door of his house that allowed realtors and their clients to have access to it. At about that time, Cagle went into Gerald's house to prepare for a realtors' open house. In the living room on an end table, Cagle saw a man's ring with a diamond. She called Goodwin, and said Gerald had left his ring on the table. Goodwin responded by staying something like " 'he just didn't want the memories' " and told Cagle to put the ring away, which she did. The evidence showed that the ring was given to Gerald by his father; Gerald cherished the ring and wore it all the time; and Gerald would not have left it in his house if he had left town.

Daughter Mary and stepson Ralph called Gerald multiple times between October 21 and October 24, but were unable to reach him. On October 25, Ralph spoke to Goodwin, and asked her to have Gerald call him. When he still did not hear from Gerald, Ralph contacted the local post office to conduct a welfare check on Gerald. A postal worker went to the house and knocked on the door, but there was no answer. The next day, on October 26, the postal worker went back to the house and met police officers there. Goodwin showed up and let the police inside. There were no signs of foul play. Goodwin said that Gerald had gone to Las Vegas. The police officers were apparently satisfied with Goodwin's response and did not conduct further investigation at that time.

10

Later that day, Goodwin called Ralph and said that Gerald did not want his family members contacting him, and that he had gone to Las Vegas with a woman named "Carmen." Several days later, Goodwin left a message with Mary that Gerald was in Las Vegas for three weeks. That same day, Gerald's cell phone accessed a cell phone tower near Goodwin's Valley Center home.

Mary and Ralph did not understand the Las Vegas and "Carmen" story, and kept attempting to contact Gerald. In response, on November 3, Goodwin called Ralph and told him that Gerald had married Carmen, they were living in Las Vegas, and they wanted no more contact with family members.

That same day, Goodwin drove Gerald's white Honda to meet the wife of an acquaintance (Jennifer Gonsalves (Jennifer)) in Escondido. Jennifer and her husband were living in a motel with their three children and were in difficult financial circumstances. According to Jennifer's trial testimony, Goodwin paid Jennifer $20 to pose as "Carmen" and call Gerald's grandson (Mary's adult son) using Gerald's cell phone. Goodwin had Jennifer practice a few times. Jennifer then left the following message on Gerald's grandson's voicemail: "[M]y name is Carmen. This message is for Mary. Uhm . . . Gerry and I got married in Las Vegas while we were visiting. I have a house here so this is where we're going to live for a while. I'm asking that you give it time to ourselves and not keep calling. Gerry can call you when he wants. Uhhh . . . don't expect to hear from us until after the holidays. I'll write you later with all the information . . . ."

11

After Jennifer used Gerald's cell phone to make this call, Goodwin asked her not to hand the phone back to her, but instead to slip the phone inside a manila envelope. Jennifer complied with that request, and then gave Goodwin the envelope. There is no record of Gerald's cell phone being used after this time; Gerald's cell phone was never located.

Immediately after the "Carmen" call, Goodwin drove to Henderson, Nevada (a residential community near Las Vegas). When she arrived, Goodwin used Gerald's debit card at a gas station and a convenience store. She then immediately turned around and drove back home to Valley Center.

While Gerald's house was on the market, real estate agent Cagle asked Goodwin regarding Gerald's whereabouts. Goodwin responded that he was on vacation in Las Vegas. Another time Goodwin said Gerald had traveled to North Carolina or South Carolina. Goodwin said he had met a "lady" at a grocery store near his house and they were going back east to see family.

Gerald's house sold for $381,000 after Goodwin forged Gerald's signature on a transfer-of-title document. The furniture was still in the house when it was sold. Gerald's personal property was also in the house, including food in the kitchen, Gerald's clothes, and Gerald's prescription medicines.

An estate sale of the house's contents yielded $4,600. Goodwin deposited the proceeds from the sale of the house and personal items into her own personal bank accounts, and then used the money to buy real estate in her name. Goodwin also moved all of the money in the Schwab account, now almost $200,000, to the joint Chase

12

accounts she held with Gerald. Goodwin spent money from the Chase accounts on more real estate, and moved the remaining funds to her personal accounts.

On November 23, Goodwin filed a document with the Department of Motor Vehicles (DMV), transferring title of Gerald's white Honda vehicle to Goodwin and her 18-year-old son. A handwriting expert testified that Goodwin forged Gerald's signature to do this. Goodwin obtained new license plates and paid $2,000 to have the car painted blue, making sure that all of the white paint was completely covered.

In total, Goodwin stole at least $600,000 from Gerald. The stolen property included the net proceeds from the sale of the house and its contents, the conversion of the Schwab account, and cash withdrawals and debits against the joint Chase account.

7. *January 2011 through July 2011 (Goodwin's arrest)*

In late 2010 and early 2011, Gerald's daughter Mary abided by Gerald's wishes (as communicated by Goodwin) that he did not want to communicate with her. She had received assurances by several others (including attorney Henderson) that Goodwin appeared to be a legitimate fiduciary. But by January 2011 Mary was growing increasingly concerned. She mailed Gerald a note, but received no response.

In early February 2011, Mary became even more concerned. Every year, Gerald sent Mary a birthday card with a $30 check that arrived on or before February 1. He had never missed a year. When she did not receive the card, on February 4, she called APS. APS then contacted Goodwin and said that Gerald needed to contact Mary.

When Mary still had not heard from Gerald, on February 14, a sheriff's detective spoke to Goodwin. Goodwin said that Gerald and his "girlfriend" Carmen, whose last

13

name Goodwin did not know, had been in Las Vegas and were now on their way to San Felipe, Mexico. According to Goodwin, she last saw Gerald and Carmen on February 4 at an Escondido Park and Ride where she gave him some paperwork. Goodwin refused to provide Gerald's contact information and she said that Gerald did not want to speak to his daughter ever again. Goodwin said Gerald was happy and should be left alone.

This information increased the family's concern. Mary and Gerald's stepson Ralph were aware that Gerald had always "hated" Mexico, was very afraid of Mexico, and would never go to that country.

The next day, Anthony Gonsalves—the husband of the woman who made the "Carmen" call to Gerald's grandson—called the detective at Goodwin's behest. Anthony said he was with Goodwin at the Park and Ride on February 4 and he corroborated her claim that she gave Gerald paperwork there. Right after that, a nervous-sounding Goodwin called and gave the detective two phone numbers for Gerald, neither of which was valid.

At trial, Anthony adhered to his story that he went to the Park and Ride with Goodwin and saw her interact with an older man. But Anthony described seeing a "tall" man between five feet 10 inches and six feet three inches. Gerald was much smaller than that. Anthony believed he saw Gerald based on Goodwin's statements; he had never met Gerald and would not know him by sight. Additionally, although Goodwin had claimed that Gerald was in Carmen's red car at the Park and Ride, Anthony said the man he saw was in light-colored (not red) car.

Several days later, on February 17, a San Diego police officer spoke with Goodwin. Goodwin told the officer she had been Gerald's trustee until two weeks earlier (February 2), and that she had last seen Gerald (and Carmen) at Gerald's house on February 2. According to Goodwin, Gerald and Carmen were going to San Felipe for three weeks and then returning to Las Vegas.

The next day, San Diego Police Detective Maura Mekenas-Parga called Goodwin. Goodwin told the detective that Gerald was having a good time in Mexico and there was nothing to worry about. Goodwin said she would have Gerald call the detective as soon as she heard from him.

About two weeks later, Detective Mekenas-Parga again spoke with Goodwin. Goodwin said that Gerald left his cell phone in Las Vegas, but that he had called her from Mexico on a private line. There was no record of this call. During the conversation, the detective asked Goodwin about Gerald's finances. Goodwin falsely said she had disbursed the proceeds from the house sale to Gerald's children.

Two weeks later, on March 15, Detective Mekenas-Parga followed up with Goodwin. Goodwin now claimed Gerald had decided to stay and live in Mexico because he was having such a good time. After speaking with Gerald's stepson Ralph two days later, the detective decided to look into Gerald's bank accounts. When Detective Mekenas-Parga contacted Goodwin to obtain Gerald's banking information, Goodwin said she did not know the name of Gerald's bank (even though she had supposedly disbursed funds from Gerald's account) and that the detective was wasting her time.

15

Eventually, Goodwin told the detective that Gerald's bank might be Chase Bank. Detective Mekenas-Parga obtained partial records from Chase, which looked suspicious. Several days later, the detective and two other detectives met with Goodwin at her house. At the meeting, Goodwin reiterated that she had last seen Gerald in early February and no longer had any of his papers, and falsely denied her continuing use of Gerald's bank accounts. When confronted with contrary banking information, Goodwin said that she had accessed the accounts so she could mail money to Gerald in Mexico. This statement was inconsistent with Goodwin's prior statements that she did not know how to get in touch with Gerald in Mexico. The detectives then demanded Gerald's Mexico contact information. Goodwin got flustered, excused herself for several minutes, and returned with a San Felipe address.

Goodwin also changed her story about what happened to Gerald's house sale proceeds. She now falsely asserted the funds were in a new Chase account that Gerald had opened. Regarding Gerald's Honda vehicle, Goodwin initially lied and said that Gerald took it to Las Vegas. After the detective reminded Goodwin that she previously stated that Gerald and Carmen were using Carmen's car, Goodwin again became flustered. At that point, she did not disclose that she gave the car to her son, forged Gerald's signature on a DMV title transfer form, and then painted the vehicle blue. She instead said that she last saw the Honda when she dusted it in the garage at Gerald's house around the time escrow closed.

During this period, Goodwin's 18-year-old son observed that Goodwin was manifesting extreme stress symptoms, and he had never seen her act like this before. At

16

one point, Goodwin asked the son whether he thought she " 'did it,' " i.e., meaning whether she caused Gerald to "go missing." The son told her he thought maybe she did. Goodwin said that her "biggest goal" was to keep her son "out of it and protected."

On April 29, Goodwin, pretending to be Gerald, called Gerald's daughter Mary from a prepaid cell phone. Disguising her voice to sound like a man, Goodwin said "sweetie pie and I have been traveling around and having a great time, and I don't want to come and live in Kansas City." Mary immediately recognized that this was not her father's voice.

Various law enforcement agencies then made efforts to locate Gerald or his body, but they found no sign of him. There was no evidence that Gerald had ever crossed the Mexican border. The San Felipe address provided by Goodwin was investigated, but Gerald had never been seen at the address or anywhere in the area. The police also recovered a February 2, 2011 change of address card in Gerald's name (but not signed by him) indicating that he moved to an address in Las Vegas. There was no evidence Gerald was ever at that Las Vegas address.

In the meantime, the police executed multiple search warrants and collected evidence from Goodwin's home, vehicles, and other sources. No evidence of Gerald's body was found. A forensic analysis of Goodwin's computer revealed she had researched overdosing with Darvocet, an opiate.

On July 12, 2011, the police arrested Goodwin and her 18-year-old son at the airport, just as they were about to depart for Europe for a two-week cruise. The son's suitcase contained almost all the clothes he owned.

17

Goodwin initially was charged only with theft/fraud offenses. But when the complaint was amended to add first degree murder, Goodwin's former husband (with whom she was on good terms) went to the jail to tell her about it. Upon hearing of the murder charge, Goodwin's immediate reaction was to begin sobbing and ask, "did they find him?" These statements were preserved on tape and played for the jury.

Goodwin also asked her former husband to look for a file that she had hidden in the garage rafters (and that had not been found during the police searches). The former husband found the file and gave it to Goodwin's attorney. The file contained some of Gerald's estate documents and other papers associated with Gerald.

### 8. *Gerald's Body Has Never Been Found*

Gerald's body has never been found. Police officers used cadaver dogs to search the areas around Goodwin's home and where Goodwin's cell phone placed her on October 21 and the following days, but found no relevant evidence. Nor did Gerald ever turn up in the databases of unidentified bodies for coroners in Southern California, Nevada, or Arizona. Although Gerald's house was searched, the police officers did not expect to find helpful clues because the new owners had completed an extensive remodeling job in early February 2011, several months before law enforcement began its serious investigation into Gerald's whereabouts.

The evidence showed that if Goodwin placed Gerald's body in a dumpster in Escondido (where her cell phone showed she was the evening of October 21), his remains would be in a landfill.

18

### 9. *Defense*

Goodwin did not testify, but she called several witnesses who testified that she had a reputation for being kind and not being violent. Her friends did not think she could hurt anyone.

### 10. *Instructions, Arguments and Verdict*

The court instructed the jury on first and second degree murder, and on the numerous theft/fraud charges. The court also instructed the jury that if it found Goodwin guilty of first degree murder, it should determine whether the prosecution proved the special circumstance allegation that Goodwin committed the murder for financial gain, i.e., that Goodwin intended to kill Gerald and that she carried out the killing for financial gain.

During his closing argument, the prosecutor acknowledged the murder charge was based on circumstantial evidence, but carefully went through the entire timeline of events to support the theory that Goodwin killed Gerald on October 21. The prosecutor emphasized Gerald's disappearance on that date; Goodwin was the last person to see him alive; the "extreme unlikelihood" that 88-year-old Gerald would have voluntarily left his home and "go underground, to live penniless, homeless and carless on the streets, and to give all of his possessions to . . . Goodwin"; the fact that Goodwin had "pilfer[ed]" all of Gerald's bank and investment accounts and had taken possession of the proceeds of his home sale, and invested in real estate taken under her own name; Goodwin's numerous and conflicting misrepresentations about Gerald's whereabouts; the absence of any

19

documentary evidence consistent with Gerald being alive after October 21; and the fact that no one else had a motive to kill Gerald.

In his closing argument, defense counsel did not discuss the theft offenses, but strongly urged the jury to reject the charge that she committed the murder, emphasizing the lack of any direct evidence of Gerald's death or disappearance, and claiming that Goodwin lacked any motive to kill Gerald. During the argument, counsel made no attempt to suggest Gerald had left town with "Carmen," and essentially acknowledged that Gerald had died and that Goodwin was probably the last person to see Gerald alive. But defense counsel argued there was no evidence that Goodwin had killed Gerald or that she had engaged in any intentional act that resulted in his death.

After several days of deliberations, the jury found Goodwin guilty of the first degree murder of Gerald (Pen. Code,[2] § 187, subd. (a)), and found true the special circumstance allegation that the murder was committed for financial gain (§ 190.2, subd. (a)(1)). The jury also found Goodwin guilty of three counts of caretaker theft from an elder (two of which concerned the Rabourns and one of which concerned victim Norris) (§ 368, subd. (e)); fraudulent appropriation by a trustee (§ 506); grand theft of personal property (§ 487, subd. (a)); grand theft of an automobile (§ 487, subd. (d)); filing a false instrument (§ 115, subd. (a)); two forgery counts (§ 470, subd. (d)); and receiving and concealing a stolen vehicle (§ 496d). The jury found the allegations true that the loss to the victims in two counts exceeded $200,000, and that in committing two or more related

---

[2]     All further statutory references are to the Penal Code.

felonies, Goodwin took more than $500,000. The jury found Goodwin not guilty of one of the theft-related allegations pertaining to victim Norris.

DISCUSSION

As her sole appellate contention, Goodwin contends the evidence is insufficient to support the jury's finding that she committed first degree murder. We first describe the applicable legal principles and review standards. We then discuss the reasons for our conclusion that substantial evidence supported the jury's findings.

I. *Applicable Law*

To establish first or second degree murder, the prosecution is required to prove beyond a reasonable doubt the defendant committed an act that caused the death of another person, and the act was committed with express malice (intent to kill) or implied malice (conscious disregard for life). (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) On first degree murder, the People must additionally prove the defendant acted willfully, deliberately, and with premeditation. (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)

Additionally, in a murder prosecution, the corpus delicti must be established. (*People v. Huynh* (2012) 212 Cal.App.4th 285, 300-301.) The corpus delicti of murder consists of the death of the victim and that a criminal agency was the cause of the death. (*Ibid*.) The corpus delicti may be proved by direct or circumstantial evidence, but must be established independently of the defendant's confessions or admissions. (*Id.* at p. 301; *Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 392.) The corpus delicti requirement is satisfied by only a slight or prima facie showing. (*People v. Huynh, supra*, at p. 301.) The showing may be made "by the introduction of evidence which

21

creates a reasonable inference that death could have been caused by a criminal agency . . . , even in the presence of an equally plausible noncriminal explanation of the event.' [Citation.]" (*Ibid.*)

In evaluating a sufficiency-of-the-evidence challenge to a corpus delicti or a murder finding, "the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) The standard of review is the same in cases in which the prosecution relies . . . on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Under this applicable review standard, "[o]ur sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.]" (*People v. Shakhvaladyan* (2004) 117 Cal.App.4th 232, 236.) Reversal on the ground of insufficient evidence " 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Id.* at p. 237.)

22

II. *Analysis*

Goodwin does not challenge the adequacy of the corpus delicti proof:  that the prosecution submitted the minimal evidence necessary to show Gerald is dead and that his death was the result of a criminal act.  Instead, Goodwin contends the evidence is insufficient to support the jury's finding that she committed murder.  Specifically, she challenges the sufficiency of the evidence to show:  (1) she committed an act that resulted in Gerald's death; (2) she acted with the requisite malice; and (3) she had the necessary premeditation and deliberation to support a first degree murder finding.

A. *Act of Murder*

Goodwin contends there was no substantial evidence that she committed an act of murder because there were no eyewitnesses to a killing, no body found, no physical evidence of harm, and she did not directly confess to or admit the crime.

It has been long established in California that the absence of the murder victim's body or other physical evidence of the murder does not preclude a first or second degree murder conviction.  (*People v. Scott* (1959) 176 Cal.App.2d 458 (*Scott*); see *People v. Ruiz* (1988) 44 Cal.3d 589, 600-601 (*Ruiz*); *People v. Von Villas* (1992) 11 Cal.App.4th 175, 246-249; *People v. Hyde* (1985) 166 Cal.App.3d 463, 478; see also *People v. Johnson* (1991) 233 Cal.App.3d 425, 442; *People v. Manson* (1977) 71 Cal.App.3d 1, 42-43; *People v. Watson* (1961) 198 Cal.App.2d 707; *Racz v. Knipp* (C.D. Cal. 2014) 2014 WL 4449791 at *16-*20.)  "The fact that a murderer may successfully dispose of the body of the victim does not entitle him [or her] to an acquittal.  That is one form of

success for which society has no reward. Production of the body is not a condition precedent to the prosecution for murder." (*Manson, supra*, at p. 42.)

In *Scott, supra*, 176 Cal.App.2d 458, the court upheld a first degree murder conviction in factual circumstances similar to here where the defendant's wife's body was never found. The defendant's wife was physically and mentally healthy when she suddenly disappeared and she left items she would have taken with her if she had left voluntarily. (*Id.* at pp. 464-474, 498-499.) Additionally, before the disappearance, the defendant had obtained control over the wife's assets allowing him to easily convert them after the wife was gone; the defendant was the only person who claimed to have contact with the wife after she disappeared; the defendant made up various false stories about her whereabouts; and after the wife's disappearance the defendant acted "consistent only with knowledge that [his wife] was dead." (*Id.* at pp. 474-488, 499.)

Although the specific issue raised in *Scott* concerned the sufficiency of the evidence to uphold the corpus delicti finding, after detailing the evidence at length, the court also determined this evidence was sufficient to support the first degree murder finding.[3] The court found "the circumstantial evidence form[ed] a complete pattern of murder" and rejected the argument that the conviction was unsupported because no direct evidence of the victim's death was introduced. (*Scott, supra*, 176 Cal.App.2d at p. 500.)

_____

3    The *Scott* court also discussed the defendant's unwillingness to explain his wife's disappearance (*Scott, supra*, 176 Cal.App.2d at p. 500), a factor that is no longer valid (see *Griffin v. California* (1965) 380 U.S. 609, 615). However, it is clear from reading the lengthy *Scott* opinion that the court would have reached the same conclusion without considering the defendant's failure to provide an explanation.

24

The circumstances here present a similarly compelling case that Goodwin's actions caused Gerald's death. Before working with Gerald, Goodwin successfully stole money from an elderly man who was mentally incompetent. She then immediately began looking to form another relationship with an elderly individual. After misrepresenting her qualifications, she obtained a caretaking position for Carolyn, Gerald's wife. While Carolyn lay dying, Goodwin began stealing her assets. After Carolyn's death, Goodwin convinced Gerald she would take care of him for free. In the next few weeks, Goodwin obtained complete legal control over Gerald's real and personal property by persuading Gerald to trust her and place her in charge of his assets. However, once she did so, she could not complete her plan—obtain *ownership* of his assets—if he remained alive. Unlike her prior mark (Norris), Gerald was mentally competent and highly protective of his money and he had family who was checking up on him and his finances (from afar). The only way Goodwin could be successful in her scheme was to make Gerald disappear.

On the day he disappeared, Gerald was in good physical health. He did not have the ability to leave town by himself (he left his car and all of his cash and checkbooks) and he left behind items he would have taken with him if he had left town (including a cherished ring, his prescription medications, his vitamins, his clothes, his cellphone). And there is no reasonable basis to support that he left San Diego with a woman (Carmen) to have "one last fling," as Goodwin suggested to others at the time.

As Goodwin's counsel admitted below, the undisputed evidence showed Goodwin was the last person to see Goodwin alive. Her cell phone records support this fact, as they show she spoke with Gerald in the morning of October 21, and then she came to his

25

house later that day, and then returned home that evening. Gerald was never seen after this date. The next day, a lockbox was placed on Gerald's door to begin the process of selling his house.

Thereafter, every act and statement by Goodwin was consistent with her knowledge that Gerald was dead and that she intended to profit from this fact. Goodwin continued to convert Gerald's assets to herself and to her son. She purchased real estate with the money, and forged his signature to register the car in her name and her son's name. She continued to lie to Gerald's relatives. And she made up numerous conflicting fictional stories about Gerald's whereabouts. She paid a person (who needed the money) to pose as Gerald's new "wife" to perpetuate the hoax that Gerald was still alive, and she attempted to impersonate Gerald when she made a phone call to daughter Mary. Since Goodwin knew Gerald was dead, she could fabricate these stories without fear of contradiction. Additionally, Goodwin's statement to Detective Mekenas-Parga that she had disbursed the proceeds of the house sale to Gerald's children reflects her knowledge that Gerald was dead. And when Goodwin learned she was being charged with murder, her immediate response was "did they find him?" This question strongly suggests Goodwin knew there was a body to be found.

Viewing the totality of the circumstantial evidence, there was ample evidence for the jury to find that Goodwin's actions resulted in Gerald's death. She had a strong motive to kill Gerald; she was the last person to see him alive (on October 21); after October 21, Goodwin made numerous statements and took actions reflecting her

26

knowledge that Gerald was no longer alive; and Goodwin made numerous misrepresentations attempting to prevent others from learning about Gerald's death.

Goodwin contends it is possible that Gerald suffered an accidental death or a death from natural causes. However, a person who dies in this manner obviously has no ability to hide his own body. (*People v. Manson, supra*, 71 Cal.App.3d. at p. 42.) Anticipating this point, Goodwin asserts that a person who perpetuates a "complicated and prolonged confidence scheme . . . would have a motive to dispose of the body even in the absence of having played a role in his death to avoid scrutiny of her fraudulent relationship with him." If Goodwin is suggesting that Gerald died of natural causes, but she made a decision not to tell anyone and hide his body to prevent anyone from discovering that she had been stealing his assets, this argument is speculative at best. Goodwin's trial counsel asserted a form of this argument to the jury, and the jury had very reasonable grounds to reject it. There was no evidence that Gerald had a life-threatening illness. Although he was 88 years old, the evidence established Gerald was in good physical shape. Likewise, there was no evidence Gerald was involved in an accident.

In this regard, we reject Goodwin's suggestion that an elevated review standard applies to murder cases where the victim's body is not found. Quoting *Scott, supra*, 176 Cal.App.2d at page 489, Goodwin argues " 'the final test to be applied [is] whether the facts found and the reasonable inferences from them *proved the nonexistence of any reasonable hypothesis of innocence*.' " (Italics added by Goodwin.) Based on this test, Goodwin maintains that because Gerald's accidental or natural death was theoretically "possible," the jury verdict must be reversed.

27

Goodwin takes the *Scott* quotation out of context. In this portion of the opinion, *Scott* was discussing the jury's role, not the role of the reviewing court. (*Scott, supra*, 176 Cal.App.2d at p. 489.) Moreover, to the extent the *Scott* court was suggesting that a reviewing court cannot uphold a murder conviction if the appellate court identifies a "reasonable hypothesis of innocence" (*ibid.*), this rule has not been adopted by the California Supreme Court. "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054; accord *Ruiz, supra*, 44 Cal.3d at p. 611 [applying this review standard in upholding murder conviction in "no body" case]; *People v. Von Villas, supra*, 11 Cal.App.4th at p. 247.)

We also find unhelpful Goodwin's reliance on a Michigan decision in which an intermediate appellate court overturned a voluntary manslaughter finding in a "no body" case. (*People v. Fisher* (Mich. App. 1992) 483 N.W.2d 452.) In *Fisher,* there was only "marginal evidence" showing the defendant's involvement in the disappearance of his wife. (*Id.* at p. 453.) Reflecting this minimal record, a representative of the state did not even appear (by brief or at the oral argument) to defend the conviction on appeal. (*Ibid.*) In overturning the verdict, the court emphasized that unlike in *Scott, supra*, 176

28

Cal.App.2d 458, there was no evidence that the defendant acted with knowledge that his wife was dead. (*Fisher*, at pp. 453-454.) The *Fisher* court also noted that the prosecutor engaged in "grossly improper closing argument," compounding the problems in the case. (*Id.* at p. 454.)

This case is different. There was overwhelming evidence that Goodwin acted with knowledge that Gerald was dead, and took numerous actions to prevent others from learning this fact, while simultaneously converting all of Gerald's assets to her own accounts. Additionally, there were no other alleged errors in the case that could or would have diverted the jury's attention from properly considering and deciding the matters at issue.

## 2. *Malice*

Goodwin next contends the evidence was insufficient to establish that if she did kill Gerald that she committed this act with malice, a necessary element of murder.

Malice can be either express or implied. A defendant acts with express malice if he manifested "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) A defendant acts with implied malice if the killing resulted from " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by [defendant] who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.)

Based on our discussion above, we have found substantial evidence to show that Goodwin killed Gerald as part of her plan to successfully carry out her criminal scheme

29

of stealing his assets and to prevent detection. In engaging in this action, Goodwin necessarily acted with the requisite malice.

Goodwin argues "[i]t is possible" Goodwin "accidentally" killed Gerald or that "she did so under a heat of passion or during a sudden quarrel." However, there is no evidence to support these theories. As Goodwin acknowledges in her appellate brief, these theories are "speculative." The jury was not instructed on heat of passion or provocation theories, and there is no contention that there was a factual basis for these instructions. Moreover, even assuming the accident or heat of passion scenarios were possibilities, there was ample evidence for the jury to reject these theories.

On the malice issue, Goodwin's reliance on *People v. Velazquez* (2011) 201 Cal.App.4th 219 is misplaced. *Velazquez* held the fact that a defendant denies wrongdoing in his testimony cannot alone support a reasonable inference that he committed the charged crime. (*Id.* at p. 231.) Here, the evidence submitted at trial went far beyond Goodwin's prior denials of any wrongdoing.

### 3. *Premeditation and Deliberation*

Goodwin also challenges the sufficiency of the premeditation and deliberation evidence. We determine the circumstantial evidence supports the jury's finding.

First degree murder differs from second degree murder in that it requires proof of premeditation and deliberation. "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not

30

require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the California Supreme Court developed guidelines to assess the sufficiency of the evidence to sustain findings of premeditation and deliberation. The court identified three categories of evidence relevant to this analysis: planning, motive, and manner of killing. (*Id.* at pp. 26-27.) The court observed that first degree murder verdicts have been upheld " ' "when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing]." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1182 (*Young*).)

The California Supreme Court has since cautioned that " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the s2ubstantive law of murder in any way.' [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*People v. Koontz, supra*, 27 Cal.4th at p. 1081.) Reviewing

courts "need not accord [the *Anderson* factors] any particular weight." (*Young, supra*, 34 Cal.4th at p. 1183.)

Considering the appellate record in its entirety, we conclude substantial evidence supports the jury's finding that Goodwin acted with the necessary premeditation and deliberation.

First, there was overwhelming evidence of motive. As detailed above, Goodwin had a substantial reason for wanting Gerald dead—so she could carry out her scheme to steal his property and avoid detection in doing so.

Second, there was powerful evidence that the killing was planned. By mid-October 2010, Goodwin had acquired legal powers over all of Gerald's assets and was ready to sell his house and invest these funds for her own benefit. But Goodwin could not achieve these goals while Gerald was still alive because he was mentally competent and monitored his finances. So Goodwin made a plan to kill Gerald. And for Goodwin's scheme to work, the death had to occur promptly—before his children and stepchildren (as well as others who were monitoring the situation) discovered Goodwin's wrongdoing.

Numerous facts point to the conclusion that Goodwin selected the October 21 date in advance. For example, a change of address form submitted to the post office on October 19 stated that, *as of October 21*, Gerald's mail was to be forwarded to a post office box in Valley Center, where Goodwin lived. Additionally, the day after October 21, Goodwin's real estate agent placed a lockbox on Gerald's house. There were also phone calls between Gerald and Goodwin on the morning of October 21, suggesting matters under discussion before Goodwin arrived at the house. Additionally, before the

32

October 21 date, Goodwin had researched overdosing with an opiate drug. Further, it is unlikely that if the death had not been planned, Goodwin would have been able to successfully dispose of the body and destroy all physical evidence with such success. (See *People v. Hyde, supra*, 166 Cal.App.3d at p. 478 ["the fact that [the victim's] body was never found circumstantially suggests a preconceived plan to dispose of the body"].)

In light of the conceded fact of Gerald's death and the very strong evidence of motive and planning, the absence of "manner" type evidence (since the body was never discovered and no physical evidence was found) did not preclude a finding of premeditation and deliberation. (See *People v. Hyde, supra*, 166 Cal.App.3d 477-478 [in "no body" case, upholding jury's premeditation and deliberation finding after analyzing *Anderson* factors where there was "substantial" evidence of motive and planning].) Based on the entirety of the circumstantial evidence, the jury had a reasonable basis to find that Gerald's death was not the result of some spur-of-the-moment decision and that Goodwin committed the act with premeditation and deliberation.

## DISPOSITION

Judgment affirmed.

HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.